# IN IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JOSÉ ROSADO-MANGUAL, <u>et al.</u>, | |
| **Plaintiffs,** | |
| v. | CIVIL NO. 15-3035 (PAD) |
| XEROX CORPORATION, | |
| **Defendant.** | |

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Plaintiffs, José Rosado Mangual, his wife and their legal conjugal partnership, sued Rosado's former employer, Xerox Corporation, alleging that Xerox terminated Rosado's employment without just cause under the Puerto Rico Unjust Discharge Act, Law No. 80 of May 30, 1976, as amended, P.R. Laws Ann. tit 29 §185a <u>et seq.</u> They claimed entitlement to Law 80's indemnity, damages for age discrimination and emotional distress, costs, expenses, and attorney's fees (Docket No. 1).

Xerox answered the complaint denying liability (Docket No. 7). Upon conclusion of discovery it moved for summary judgment in conformity with Rule 56 of the Federal Rules of Civil Procedure, pointing out that the record shows just cause for termination of Rosado's employment (Docket No. 44). Plaintiffs opposed the motion (Docket No. 54). Xerox replied (Docket No. 65) and plaintiffs surreplied (Docket No. 72). On March 30, 2018, the court granted Xerox's motion (Docket No. 89). Following are the grounds in support of the court's ruling.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "genuine" if it could be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). It is "material" if it potentially affects the outcome of the case in light of applicable law. Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought. See, Shafmaster v. U.S., 707 F.3d. 130, 135 (1st Cir. 2013)(so noting). To resist summary judgment, however, the nonmovant must do more than show some metaphysical doubt as to a material fact. See, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(articulating proposition). Conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative, however, will not suffice to ward off a properly supported summary judgment motion. See, Nieves-Romero v. U.S., 715 F.3d 375, 378 (1st Cir. 2013)(applying principle). Based on these parameters, careful record review shows absence of genuine factual dispute as to the facts identified in the section that follows.

## II.    FINDINGS OF FACT[1]

### A. Employment History

Xerox sells document technology products, document solutions and services (Docket No. 44, p. 3). Rosado was employed with Xerox from 1985 to 2014. In December 1985, he began working for the Company as a Marketing Trainee. See, Docket No. 45, "Defendant's Statement of Uncontested Material Facts in Support of Motion for Summary Judgment" ("SUMF") ¶ 1; Docket No. 55, "Plaintiffs' Opposing Statement of Material Facts in Support of their Response in Opposition to Defendant's Motion for Summary Judgment" ("OSMF") ¶ 1. In 1995, he was promoted to District Solutions Sales Manager, supervising approximately 20 employees. See, SUMF ¶¶ 24-25; OSMF ¶¶ 24-25. On May 30, 2002, he was removed from the managerial position and assigned to the position of Product Solution Sales Executive ("PSSE"), where he remained until his termination in March 2014. See, SUMF ¶¶ 36, 134; OSMF ¶ 36; Docket No. 45-28 at p. 1.

As explained in detail below, Xerox terminated Rosado's employment with just cause. He violated company policy in creating an environment of fear, distrust and antagonism, being demeaning towards women and threatening employees with loss of their jobs; using the corporate credit card for personal expenses; circumventing the Company's collection policy by arranging the

---

[1] The facts included in this section are drawn from the parties' Local Rule 56 submissions (Docket Nos. 45, 55, 66). Local Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." CMI Capital Market Investment, LLC v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008). It requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by specific citations to the record, that the movant contends are uncontested and material. See, Local Rule 56(b) and (e). The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph. Id. The opposing party may also present, in a separate section, additional facts, set forth in separate numbered paragraphs. Id. A separate section: (1) allows the moving party to reply to those additional facts; and (2) allows the court to easily determine the disputed facts. See, Malavé-Torres v. Cusido, 919 F.Supp.2d 198, 207 (D.P.R. 2013)(explaining rule).

provision of supplies to a delinquent, non-paying customer; driving for approximately eight months on company business with an expired driver's license, a misdemeanor exposing Xerox to potential civil liability; and lying during the investigation regarding the driver's license.

## B. Policies and Training History

Upon commencement of his employment with Xerox, Rosado acknowledged he had the obligation to read and understand the Company's policies applicable to his position and to seek advice from management if he had questions regarding them. See, SUMF ¶ 5.[2] Rosado was also aware that violation of Xerox's policies could result in disciplinary action, up to and including termination of employment. See, SUMF ¶7.[3]

Xerox has a Code of Business Conduct which delineates the Company's core values and outlines its general expectations regarding employee behavior. See, SUMF ¶ 8.[4] Xerox employees receive annual email reminders to complete the required training on the Code of Business Conduct, and to acknowledge completion of that training in Xerox's E-Learning system. See, SUMF ¶ 11.[5]

---

[2] Plaintiffs qualify this statement stating that Rosado did not recall the policy document presented in support of the statement. See, OSMF ¶ 5. And they argue that Xerox had many policies, standards, guidelines and procedures over the 160 countries it operated in, that not all policies applied to him, and that Marlene Williams, his supervisor at the time, did not know how many policies Rosado or employees in the sales organization had to adhere to. Id.

[3] Plaintiffs object to this statement on the basis that the evidence cited does not support the factual assertion proposed. But in the deposition testimony cited, Rosado agrees that he "knew that violation of Xerox policies could result in corrective action up to and including termination" (Docket No. 45-1, pp. 46-47).

[4] Plaintiffs qualify this statement alleging that the Code of Business Conduct was amended several times throughout Rosado's tenure at Xerox and the document could not be connected to any training Rosado had received. See, OSMF ¶ 8. The qualification does not contradict the statement.

[5] Plaintiffs deny this statement arguing that Rosado participated in trainings about different versions of the Code of Business Conduct, which changed every year. See, OSMF ¶ 11. Further, they state that Rosado had not seen the Code of Business Conduct cited as evidence for the statement nor "correlate its content to any of the trainings" he had previously received. Id. The Code of Business Conduct cited as evidence is the printed version and what Rosado had seen were electronic versions of the document (Docket No. 45-2, p. 2 L. 17 – p. 3 L. 4, p. 3 L. 19-22). Rosado said that as Manager, he was familiar with the Code but that it changed every year, which was why he took trainings (Docket No. 45-2, p. 3 L. 24 – p. 4 L. 12). And he received training or refresher training on the Code on May 19, 2004, May 22, 2006, September 15, 2009, August 20, 2010, September 6, 2011, August 28, 2012, and June 21, 2013 (Docket No. 45-1 p. 50 L. 4 – p. 51 L. 10). The meaning he ascribed to the term "correlate" is unclear, but he testified

The Code of Business Conduct training includes links to policies referenced in the training and informs employees that there are additional policies that may govern Xerox's forms of conducting business. See, SUMF ¶ 12.[6] These policies are accessible through the Company's internal website. See, SUMF ¶ 10.[7] Rosado completed trainings on the Code of Business Conduct and other policies mostly online from 2004 to 2006 and from 2009 through 2013, SUMF ¶ 17,[8] through Xerox's Worldwide Learning Services, an electronic learning system. See, SUMF at ¶ 15.[9]

## C. Incidents

### i. Creating Environment of Fear/Removal from Managerial Position

During his tenure as District Solutions Sales Manager, Rosado reported to different managers at different times: Rafael González, Jeffrey Hansen, Mark Cates, and Alberto Añeses. See, SUMF ¶ 26; OSMF ¶ 26. On June 16, 2000, Hansen, Rosado's manager at the time, sent him a memorandum informing Rosado that his leadership skills were being negatively perceived by

---

that he did not know of any other Code of Business Conduct (Docket No. 45-2, p. 3 L. 13-18). In fact, one of the responsibilities he had as a Manager was to ensure that the employees he supervised complied with the Code of Business Conduct (Docket No. 45-2, p. 27 L. 16 – p. 28 L. 24).

[6] Plaintiffs deny this statement asserting that that Xerox had "many policies, standards, guidelines and procedures over the 160 countries it operated in, that not all of the company's policies applied to him, and that the company determined which policies PSEs had to follow. See, OSMF ¶ 12. The denial does not contradict the statement.

[7] Plaintiffs qualify this statement claiming that Xerox had "many policies, standards, guidelines and procedures over the 160 countries it operated in, that not all of these policies applied to him, and that Marlene Williams, his supervisor at the time, testified that employees did not have to acknowledge every policy that they were obligated to comply with. See, OSMF ¶ 10. The qualification does not contradict the statement.

[8] Plaintiffs object to this statement, contending that part of the evidence cited in support, Rosado's own testimony, cannot adequately support the statement as he has no personal knowledge of what was contained in his Learning History. See, OSMF ¶ 17. However, Xerox also refers to Rosado's Learning History, which Rosado recognized (Docket No. 45-1, p. 48 L. 24-25), and supports the statement.

[9] Plaintiffs do not contest Rosado's knowledge of the Xerox's Worldwide Learning Services (an internal website) and how to operate the system. Also, they do not contest Rosado's knowledge that all electronic policies included links to other policies referenced in the training, providing immediate access to the policies mentioned therein.

other employees in the Puerto Rico office. See, SUMF ¶ 27.[10]  Hansen requested that Rosado "maintain a healthy work environment." Id.[11]  In late November of the same year, González met with Rosado to discuss negative feedback he had received about Rosado's behavior. See, SUMF ¶ 28.[12]  On December 7, 2000, Rosado sent González a memorandum acknowledging the conversation they had regarding Rosado's interpersonal skills and providing other managers' feedback about his behavior towards other employees. See, SUMF ¶ 29.[13]

On April 3, 2001, Mark Cates sent Rosado a memorandum informing him that employees had the right to use Xerox's Open Door Policy and that he expected Rosado to observe Xerox's anti-retaliation policy. See, SUMF ¶ 30.[14]  Sometime in 2002, several of Rosado's direct reports complained to Luz Barreto, Human Resources Assistant, about the way Rosado treated them. See, SUMF ¶ 31.[15]  Specifically, they complained that Rosado was disrespectful and undermined them

---

[10] Plaintiffs object to this statement alleging that Rosado did not receive the memorandum cited in support of the statement. See, OSMF ¶ 27. Furthermore, they contend that the memorandum is not properly authenticated and constitutes inadmissible hearsay evidence. Id. The document is part of Rosado's personnel file, and as explained in the Appendix, was properly authenticated and is not inadmissible hearsay. Further, Rosado signed the Final Warning on the issue (Docket No. 65, p. 12).

[11] Plaintiffs object to this statement arguing that Rosado did not receive the memorandum cited in support of the statement. See, OSMF ¶ 27. Furthermore, they contend that the memorandum is not properly authenticated and constitutes inadmissible hearsay evidence. Id. For the reasons referred to in the previous footnote, the objection is not persuasive.

[12] Plaintiffs deny this statement asserting that Rosado testified that he met with González to discuss "generally the perception of the sales team in Puerto Rico." See, OSMF ¶ 28. Their denial does not materially contradict the statement however plaintiffs characterize the meeting between Rosado and González.

[13] Plaintiffs qualify this statement claiming that Rosado sent González a memo because he "had inquired about the perception of the team and [had] given [Rosado] the task to ask his peers and assess their perception of the sales team in the office." See, OSMF ¶ 29. Plaintiffs highlight that those colleagues "categorized [Rosado's] behavior as professional." Id. The qualification does not materially contradict the statement.

[14] Plaintiffs object to this statement contending that Rosado did not receive the memorandum referenced in support of the statement. See, OSMF ¶ 30. Additionally, they argue that the document was not properly authenticated by Xerox and that it constitutes inadmissible hearsay. Id. For the reasons referred to in footnote 10, the objection is not persuasive.

[15] Plaintiffs object to and qualify this statement alleging that Barreto, whose deposition is used in support of the statement, does not have personal knowledge of the purported complaints as she herself did not experience any

in front of others. See, SUMF ¶31.[16] The Company's Code of Conduct seeks to prevent harassment and bullying, violence, discrimination, coercion and discrimination of any kind (Docket No. 45-9, pp. 730, 740).[17]

Human Resources conducted an investigation into the employees' complaints. See, SUMF ¶ 33.[18] As a result of the investigation, Xerox issued Rosado a warning letter for creating an environment of fear, distrust and antagonism, being demeaning towards women and threatening employees with loss of their jobs. See, SUMF ¶34.[19] The letter stated that all company policies

---

[16] Plaintiffs object to and qualify this statement asserting that Barreto, whose deposition is used in support of the statement, does not have personal knowledge of the purported complaints as she herself did not experience any situation in which Rosado was disrespectful or diminished an employee in front of her. See, OSMF ¶ 31. Neither the denial nor the qualification contradicts the statement.

[17] Employers have a legitimate interest in promoting a work environment where employees can work in peace and with the peace of mind that they will not be assaulted, bullied, harassed or threatened by their colleagues, See, SLG Torres-Matundan v. Centro Patología, 193 D.P.R. 920, 935 (2015)(Cert. Trans., pp. 8-9)(recognizing effect of misconduct at issue on the work environment and employer's interest in preventing it). Bullying, harassment and similar conduct unduly interfere with order, safety and efficiency in the workplace. Id.

[18] Plaintiffs qualify this statement claiming that Rosado was not aware of an investigation into specific complaints from employees regarding his treatment of them. See, OSMF ¶ 33. They qualification does not contradict the statement.

[19] Plaintiffs deny this statement contending that Rosado did not engage in the conduct charged in the letter, and state Rosado's Performance Excellence Plan for the year 2002 concluded that he was "professional with customers and peers." See, OSMF ¶ 34. Yet the issue leading up to the letter involved people Rosado supervised, that is, subordinates, not peers or customers. As defined in *Merrian-Websters Collegiate Dictionary* (11th Ed. 2003), "peer" is "one that is of equal standing with another," whereas a "subordinate" is "placed in or occupying a lower class, rank or position." Likewise, *Webster' New World Dictionary* (3d College Ed. 1988) defines "peer" as "a person or thing of the same rank …" and "subordinate" as "inferior to or placed below another in rank, power, importance, etc.,,, under the power or authority of another." Rosado supervised close to twenty individuals (Docket No. 45-2, p. 27 L. 16 – p. 28 L. 13). Further, Rosado signed the document, and there is no evidence that he contemporaneously denied or qualified the document's content or conclusions. Moreover, as discussed in more detail below, the inquiry centers on whether the employer in good faith reasonably believed that the employee had engaged in misconduct. See, EEOC v. Total System Services, Inc., 221 F.3d 1171, 1176 (11th Cir. 2000)(examining topic). And nothing in the record undermines Xerox's good faith belief that Rosado engaged in the conduct described in the 2002 letter. See, Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470-1471 (11th Cir. 1991)(employer reasonably believed that plaintiff was guilty of harassment where, among other things, faced with the Memorandum of the Deficiency Interview, he signed without objection the paper confirming that the harassment had taken place). Consequently, the Company could validly rely on what the document states in making future employment decisions, like the one made here.

[cont. 15] situation in which Rosado was disrespectful or diminished an employee in front of her. See, OSMF ¶ 31. Neither the denial nor the qualification contradicts the statement.

had to be followed in order for Xerox to conduct its business effectively and fairly, and therefore policy violations were considered a serious matter. See, SUMF ¶ 39.[20] Additionally, the letter warned that further policy violations could lead to more severe corrective or disciplinary action "up to and including termination." See, SUMF ¶ 38.[21] As a result, Rosado was removed from the managerial position and reassigned to a Product Solutions Sales Executive ("PSSE") position, a non-supervisory role, effective June 1, 2002, and did not receive a merit increase. See, SUMF ¶¶ 36-37.[22]

ii. **Use of Corporate Credit Card for Personal Expenses**

As a PSSE, Rosado applied for an American Express Corporate Card, which Xerox approved on October 22, 2002. See, SUMF ¶¶ 40-41; OSMF ¶¶ 40-41.[23] The American Express

---

[20] Plaintiffs admit that all business policies had to be followed in order for Xerox to conduct its business effectively. See, OSMF ¶ 39. However, they qualify the rest of the statement stating that not all policy violations led a Xerox employee to be terminated, even when an employee had committed more than one infraction. See, OSMF ¶ 39. The qualification does not contradict the statement.

[21] Plaintiffs admit that the letter Rosado received made him aware that "any future violation of Xerox Business Policies…would be cause for more severe corrective disciplinary action up to and including termination from his employment with Xerox." See, OSMF ¶ 38. However, they deny Rosado engaged in the conduct charged in the letter and argue that not all policy violations led a Xerox employee to be terminated, even when the employee had committed more than one infraction. Id. Rosado signed the letter and as noted in footnote 18, there is no evidence that he contemporaneously denied or qualified the document's content or conclusions. Further, as pointed out therein, the inquiry centers on whether the employer in good faith believed the employee had done something wrong. And nothing in the record undermines Xerox's good faith belief that Rosado engaged in the conduct described in the 2002 letter. Finally, the fact that not all policy violations led to termination does not contradict the statement either.

[22] Plaintiffs deny this statement. First, they argue that Rosado did not engage in the conduct charged in the letter. See, OSMF ¶ 36-37. Second, they state that Rosado was reassigned to a PSSE position but received the same compensation and that his managerial position was eliminated. See, OSMF ¶ 36. As for allegedly not engaging in the conduct charged, Rosado signed the letter and as noted in footnotes 18 and 20, there is no evidence that he contemporaneously denied or qualified the document's content or conclusions. Further, nothing in the record undermines Xerox's good faith belief that Rosado engaged in the conduct described in the 2002 letter. With regard to the position to which Rosado was reassigned, at the end of the day he was removed from a managerial position and did not receive a merit increase.

[23] Corporate credit cards afford employees a useful method for making legitimate, business related purchases without having to pay for those transactions out-of-pocket, thus facilitating the employee's rendition of services for the employer and the employer's business. Misuse of the card for personal expenses may expose the employer to that debt. For a discussion of credit card markets and business models, see, Ohio v. American Express Co., ---U.S.----, 138 S.Ct. 2274, 2279-2283, 2291-2294 (2018).

Corporate Card application's accompanying memorandum, both of which Rosado signed, stated that the corporate card was to be used only for expenditures associated with Xerox's business transactions. See, SUMF ¶ 42.[24] Rosado was aware that abuse of the corporate card was a violation of Xerox policy and subject to disciplinary action up to and including termination. See, SUMF ¶ 44.[25]

On February 6, 2012, Xerox's financial services organization contacted Barreto indicating that it appeared as if Rosado had used his corporate card for personal expenditures. See, SUMF ¶ 45; OSMF ¶ 45. Eric Pérez, General Manager, and Barreto conducted an internal policy investigation on the matter. See, SUMF ¶ 46; OSMF ¶ 46. They interviewed Rosado, who admitted having used his corporate card for personal expenses. See, SUMF ¶ 47.[26] The investigation revealed that he had used his corporate card from October 2011 through January 2012 for personal expenditures amounting to approximately $12,000. See, SUMF ¶ 48.[27]

On February 21, 2012, Rosado received a written warning for violating Xerox's Global American Express Policy, as "using the AMEX card for personal use [was] in violation of the

---

[24] Plaintiffs deny the statement alleging the card could be used for personal expenditures in some instances. See, OSMF ¶ 42. But the evidence cited in support of plaintiffs' denial, Rosado's own deposition testimony, expresses that "non-reimbursable personal charges could be made to the card when it was included on a bill for overall business expenses, as for example, when there was a non-reimbursable charge for an in-room movie rental included on a hotel bill incurred for business travel." Docket No. 45-4 at p. 31. Thus, the denial does not contradict the statement.

[25] Plaintiffs deny this statement "as asserted," claiming that Rosado "was aware that the memorandum stated that 'abuse of the corporate card c[ould] lead to immediate card cancellation, management notification, and possible termination from the corporation'." See, OSMF ¶ 44. The denial does not contradict the statement.

[26] Plaintiffs qualify this statement arguing that during the meeting Rosado explained that he used the American Express corporate card for personal expenses, he had undergone a divorce process that left him in a precarious situation, and that situation was understood by Xerox. See, OSMF ¶ 47. The qualification does not contradict the statement.

[27] Plaintiffs qualify the statement claiming that Rosado testified that: he did not recall the amount charged to the corporate card; the investigation revealed that he had paid these charges in full; he had gone through a divorce process that left him in a difficult economic situation; and Xerox understood this. See, OSMF ¶ 48. The qualification does not contradict the statement.

policy.  See, SUMF ¶ 49; OSMF ¶ 49.[28]  The Written Warning reiterated that further policy violations could result in "more severe corrective or disciplinary action, up to and including termination of employment with Xerox."  See, SUMF ¶ 51; OSMF ¶ 51.[29]

### iii.    Optimática

Xerox's Collections organization is responsible for, among other tasks, implementing billing and collections processes to ensure timely payments by customers and to reduce bad debt.  See, SUMF ¶ 53; OSMF ¶ 53.  Xerox Credit Representatives collect overdue payments from customers, monitor delinquent accounts and implement collection processes, including the "Stop Service/ Stop Supplies" process.  See, SUMF ¶ 54; OSMF ¶ 54. To encourage payment by delinquent customers and limit loss due to customer nonpayment, Xerox would place an account on "Stop Service/Stop Supplies" status after unsuccessful collection efforts and the account balance was at least sixty days past due, among other requirements.  See, SUMF ¶ 56.[30]

If a delinquent customer is on "Stop Service/Stop Supplies" status and needs service or supplies from Xerox, the Company could grant a one-time service or supplies order if the customer first made payment towards the amount past due.  See, SUMF ¶ 57; OSMF ¶ 57.  Rosado was

---

[28] Plaintiffs admit the content of the letter, which states that Rosado was "involved in a violation of Xerox policy." See, OSMF ¶ 49.  But they add that Xerox did not provide Rosado with a written copy of Xerox's GDC 200 Global American Express Policy.  Id.  The assertion does not contradict the statement, particularly when Rosado was aware that the corporate credit card was to be used for business, not personal purposes (Docket No. 45-22, p. 1), and he signed the letter without disclaiming knowledge of the policy.

[29] Plaintiffs admit the content of the letter, but qualify the statement asserting that "Xerox had expunged Rosado's previous policy violation from 2002." See, OSMF ¶ 51.  As support, they refer to a 2012 investigation report in which Luz Barreto, the primary investigator, marked a box stating that Rosado had not committed previous policy violations (Docket No. 45-24, p. 3).  Yet Barreto testified that she did not review the record to prepare the document (Docket No. 85-6, p. 86 L. 5-7).  Moreover, there is no evidence that the document had been removed from Rosado's personnel file or that Xerox has or had an expungement policy.  Therefore, there is no support for the assertion that Xerox expunged the 2002 violation.

[30] Plaintiffs qualify this statement claiming that Rosado had not been provided with written copy of this policy.  See, OSMF ¶ 56.  The qualification does not contradict the statement.

aware that when Xerox placed an account on "Stop Service/Stop Supplies" status, neither services nor supplies could be provided to that customer. See, SUMF ¶ 59.[31] Furthermore, a violation of the collections policy alone could result in termination, depending on the severity of the incident. See, SUMF ¶ 61.[32]

In 2011, Optimática, a print shop, entered into a contract with Xerox. See, SUMF at ¶ 62[33]. Optimática's authorized representative was Marcos Tañón. See, SUMF ¶ 63.[34] In early 2014, due to a pattern of late payments, Xerox placed the Optimática account on "Stop Service/Stop Supplies" status. See, SUMF ¶¶ 64-65.[35] As of January 31, 2014, the client had an open balance of over $19,000. See, SUMF ¶ 66.[36]

On January 27, 2014, Rosado approached Luis Vázquez, a Xerox Credit Representative in the Collections Department, to request help because the Optimática Account was on "Stop

---

[31] Plaintiffs deny this statement contending that Rosado would not have sold machines to customers had he been aware they were on "Stop Service/Stop Supply" status. See, OSMF ¶ 59. The denial does not contradict the statement.

[32] Plaintiffs admit that Angela Lisath, Human Resources Manager, testified to this effect, but qualify the statement pointing out that: Rosado did not acknowledge the Collection of Accounts Receivable policy; the policy did not include the consequences of non-compliance with the Stop Services/Stop Supplies policy; and in order for Xerox to conclude there had been a violation of collections policy, Xerox had to conduct a responsible investigation. See, OSMF ¶ 61. The qualification does not contradict the statement.

[33] Plaintiffs qualify this statement stating that Rosado did not recall Optimática's account and that he was not aware it entered into a contract with Xerox in 2011. See, OSMF ¶ 62. The qualification does not contradict the statement.

[34] Plaintiffs qualify this statement alleging that Rosado only recalled Tañón as the son of a previous client and did not recall the Optimática account. See, OSMF ¶ 63. The qualification does not contradict the statement.

[35] Plaintiffs qualify this statement arguing that Rosado was not aware of Optimática's status with Xerox; the credit representative in charge of placing accounts on "Stop Services/Stop Supplies" status did not recall when the account was placed on that status; and Optimática's account had been in "Stop Service/ Stop Supplies" status for years and had been given a one-time service approximately ten times. See, OSMF ¶ 64. The qualification does not contradict the statement.

[36] Plaintiffs object to this statement asserting that the evidence cited does not support the factual assertion. See, OSMF ¶ 66. But the document cited supports the statement. See, Docket No. 45-28 at p. 2. Plaintiffs also assert that Rosado did not recall Optimática's status with Xerox. Id. The assertion does not, however, contradict the statement.

Service/Stop Supplies" status and it needed supplies. <u>See</u>, SUMF ¶ 69.[37] Vázquez confirmed that

the account was on "Stop Service" status, and that it could not be serviced unless the client made

a payment towards its debt. <u>See</u>, SUMF ¶ 70.[38] Rosado told Vázquez that he would speak to the

customer. <u>See</u>, SUMF ¶71.[39] Later that day, Vázquez overheard a telephone conversation between

Rosado and another person he believed was Tañón, in which Rosado said that he had contacted

another customer who had the same equipment as Optimática which would provide Tañón with

the supplies he needed. <u>See</u>, SUMF ¶ 73.[40] He also heard Rosado tell the other person not to

worry and that Rosado had done this before with other customers. <u>See</u>, SUMF ¶ 73.[41]

As such action constituted bypassing of the collection policy, Vázquez immediately

informed his supervisor, Luz Negrón, what he had overheard. <u>See</u>, SUMF ¶ 75; OSMF ¶ 75. Upon

learning of the incident, human resources personnel began an investigation to determine whether

---

[37] Plaintiffs deny this statement because Rosado testified he had no recollection of Vázquez, Tañón or the Optimática Account. <u>See</u>, OSMF ¶ 69. The denial does not contradict the statement.

[38] Plaintiffs deny this statement because Rosado testified he had no recollection of Vázquez, Tañón, or the Optimática Account. <u>See</u>, OSMF ¶ 70. The denial does not contradict the statement.

[39] Plaintiffs deny this statement because Rosado testified he had no recollection of Vázquez, Tañón, or the Optimática Account. <u>See</u>, OSMF ¶ 71. The denial does not contradict the statement.

[40] Plaintiffs deny this statement claiming that Rosado testified that he never attempted to bypass the "Stop Service/Stop Supplies" process. <u>See</u>, OSMF ¶ 73. As support, they refer to lines 1-5 of page 21 of his deposition. <u>Id</u>. What Rosado testified was he did not recall doing it (that is, attempting to bypass the stop service supplies collection process)(Docket No. 45-3, p. 121, L. 1-5). Be that as it may, however, he knew that for a customer on "Stop Service/Stop Supplies" status to be serviced by Xerox, it had to pay in accordance with Xerox's policy (Docket No. 45-3, p. 24 L. 22 – p. 25 L. 19; Docket No. 45-4, p. 36 L. 2 – p. 37 L. 9). Plaintiffs contend Vázquez testified that: he did not have personal knowledge on whether Rosado was talking to Tañón; was not a part of the telephone conversation; and it was possible Rosado was not talking to Tañón (Docket No. 55 ¶ 73). As discussed below, the central inquiry is whether the employer in good faith reasonably believed that the employee did something wrong, and nothing in the record undermines Xerox's good faith belief that Rosado bypassed the collections policy.

[41] Plaintiffs deny this statement pointing out that Rosado testified he never attempted to bypass the "Stop Service/Stop Supplies" process. <u>See</u>, OSMF ¶ 73. Additionally, they contend Vázquez testified that: he did not have personal knowledge as to whether Rosado was talking to Tañón; was not a part of the telephone conversation; and it was possible Rosado was not talking to Tañón. <u>Id</u>. The denial is unpersuasive for the reasons explained in the previous footnote.

a policy violation occurred.  <u>See</u>, SUMF ¶ 77.[42]  Angela Lisath, Human Resources Manager, was assigned to investigate the allegations.  <u>See</u>, SUMF ¶ 78.[43]  Negrón prepared a written summary of the incident reported to her by Vázquez.  <u>See</u>, SUMF ¶ 79.[44]  Subsequently, Lisath and Del Hernández, Brand Protection Investigator, interviewed Vázquez and Rosado about the incident.  <u>See</u>, SUMF ¶ 81; OSMF ¶ 81; SUMF ¶ 83.[45]

As part of Xerox's investigation into Vázquez's report, Hernández set out to obtain Rosado's company phone records.  <u>See</u>, SUMF ¶ 86.[46]  A series of mistakes led Hernández to review the incorrect window of time (December 27, 2013 instead of January 27, 2014).  <u>See</u>, SUMF ¶¶ 87-89.[47]  As a result, he could not confirm that there had been calls between Rosado and

---

[42] Plaintiffs object to this statement alleging that the supporting evidence was not properly authenticated by Xerox and contains inadmissible hearsay evidence.  <u>See</u>, OSMF ¶ 77.  As discussed in the Appendix, the evidence was properly authenticated.

[43] Plaintiffs qualify this statement asserting that Rosado was not aware that Xerox was investigating the allegations against him.  <u>See</u>, OSMF ¶ 78.  The qualification does not contradict the statement.

[44] Plaintiffs object this statement arguing that the supporting evidence was not properly authenticated by Xerox.  <u>See</u>, OSMF ¶ 79.  For the reasons explained in the Appendix, the evidence was properly authenticated.  Additionally, plaintiffs state "the record shows contradictory evidence as to the facts surrounding the investigation of Vázquez's allegations."  <u>Id.</u>  The asserted contradictions are immaterial, and do not change the fact that Vázquez reported what he stated to have overheard; at some point other individuals were informed of what Vázquez overheard; and a written summary was prepared.

[45] Plaintiffs deny this statement claiming Rosado was not aware that Xerox was conducting an investigation into Vázquez's allegations and that, instead, Rosado attended a conference call in which he "was asked <u>generally</u> how he worked with customers when they ha[d] supply issues."  <u>See</u>, OSMF ¶ 83.  So, he was interviewed.

[46] Plaintiffs object to this statement on grounds that the evidence in support was not properly authenticated by Xerox and contains inadmissible hearsay.  <u>See</u>, OSMF ¶ 86.  The statement is admissible.  As discussed in the Appendix, the phone records present a different issue, but they do not contradict the statement.

[47] Plaintiffs object to this statement on the grounds that the supporting evidence was not authenticated by Xerox and constitutes inadmissible hearsay.  <u>See</u>, OSMF ¶¶ 87-88.  The statement is admissible.  As explained in the Appendix, the phone records present a different issue, but they do not contradict the statement.

Tañón.  See, SUMF ¶ 89.[48]  Lisath, however, found Vázquez's declaration credible.  See, SUMF ¶ 90.

### iv.    Driver's License

Rosado was a participant in Xerox's Auto Equity Program, pursuant to which Xerox reimburses employees for expenses associated with the business use of a personally owned or personally leased motor vehicle.  See, SUMF ¶93; Docket No. 45-37, p. 1.[49]  To participate in the Program, employees need a valid driver's license.  See, SUMF at ¶ 94; Docket No. 45-37, pp. 2, 5.[50]  Driving without a valid driver's license on company business violates company policy.  See, SUMF ¶ 114.[51]

On February 25, 2014, while the investigation into the Optimática Incident was ongoing, Robert Mulhern, Xerox Security Analyst, sent Rosado an email stating that Rosado's driver's license had expired, directing him to renew his license as soon as possible, and requesting a copy

---

[48] Plaintiffs object to this statement on the grounds that the supporting evidence was not authenticated by Xerox and constitutes inadmissible hearsay.  See, OSMF ¶¶ 89.  The statement is admissible.  As explained in the Appendix, the phone records present a different issue, but they do not contradict the statement.

[49] Plaintiffs qualify this statement contending that Rosado did not receive a written copy of the Auto Equity Program policy. See, OSMF ¶ 93.  His online training record shows the Program policy acknowledgment (Docket No. 45-8, p. 2 L. 42; p. 4 L. 23), and he admitted receiving an update (Docket No. 45-3, p. 26 L. 12-21).

[50] Plaintiffs qualify this statement pointing out Rosado was not provided with a written copy of the Auto Equity Program policy.  See, OSMF ¶ 94.  His online training record shows the Program's policy acknowledgment (Docket No. 45-8, p. 2 L. 42; p. 4 L. 23), and he admitted receiving an update (Docket No. 45-3, p. 25 L. 12-21).  Plaintiffs assert that the purpose of the Program was to reimburse employees for some expenses incurred while driving their personal vehicles for the business, and the consequence for not possessing a valid, unrestricted driver's license was that the employee would be removed from the program.  Id.  The assertion does not contradict the statement.

[51] Plaintiffs deny this statement stating that Rosado was not provided with a copy of the Auto Equity Program policy; the consequences of not complying with the eligibility requirements was that the employee would be removed from the program; and Rosado was not notified that he could be terminated for not renewing his driver's license.  See, OSMF ¶ 113.  The predicates of the denial do not contradict the statement, Rosado's online training record shows the Program's policy acknowledgement (Docket No. 45-8, p. 2 L. 42, p. 4 L. 23), and he admitted receiving an update (Docket No. 45-3, p. 25 L. 12-21).  Plaintiffs allege that the training document was not properly authenticated.  But as explained in the Appendix, the document was properly authenticated.

of the renewed license. <u>See</u>, SUMF ¶ 95.[52] By February 2014, Rosado had been driving on

Xerox's business with an expired driver's license for approximately eight months, since June 2013.

<u>See</u>, SUMF ¶ 98.[53] Williams, who had been copied on the email from Mulhern to Rosado,

informed Rosado she received notification that the license had expired and Rosado needed to

renew the license. <u>See</u>, SUMF ¶¶ 95, 100.[54] By March 6, 2014, Rosado had not responded to the

email, leading Mulhern to send a follow-up message copying Williams and Lisath, asking Rosado

to respond with the status of his license renewal by the end of the day, and stating he had to renew

the license that same day in order to continue to drive on Xerox business. <u>See</u>, SUMF ¶ 101.[55]

Rosado responded he was in the process of renewing his license and that "the P.R. offices that

expedite renewals [were] closed from November until the last week of January." <u>See</u>, SUMF ¶

---

[52] Plaintiffs admit that Rosado received an email from Mulhern stating that his driver's license had expired. <u>See</u>, OSMF ¶ 95. However, they object to the rest of the statement claiming that Williams' deposition testimony (Exhibit H of Xerox's submission) does not support the fact stated and Exhibit EE (email threads) was not properly authenticated by Xerox and constitutes inadmissible hearsay. <u>Id.</u> Yet the deposition testimony does refer to the expired license, and as discussed in the Appendix, Exhibit EE was properly authenticated and does not constitute inadmissible hearsay. Finally, plaintiffs assert that during the first week of March, Williams agreed with Rosado a two-week time frame for him to get his renewed driver's license, which he did, on March 15, 2014, and that she did not advise Rosado he could be terminated for failing to provide a valid driver's license. <u>See</u>, OSMF ¶¶ 101. Williams denied having given Rosado a time frame to renew the license (Docket No. 45-14, p. 17, L. 6-8; p. 44, L. 8-12; p. 45, L. 1-5). At any rate, the assertion does not contradict the statement.

[53] Plaintiffs qualify this statement claiming Rosado was not aware that his driver's license had expired in June 2013 and was driving his personally-owned vehicle. <u>See</u>, OSMF ¶ 98. The qualification does not contest the statement.

[54] Plaintiffs assert Williams admitted she did not know when it was that she spoke with Rosado, albeit it was after receiving Mulhern's email, and she gave Rosado the opportunity to fix the problem but did not advise Rosado he could be terminated for not providing a valid driver's license. <u>See</u>, OSMF ¶ 100. The assertion does not contradict the statement.

[55] Plaintiffs object to this statement arguing that the document supporting the factual assertion was not properly authenticated by Xerox and that it constitutes inadmissible hearsay. <u>See</u>, OSMF ¶ 101. As explained in the Appendix, the document was properly authenticated and does not constitute inadmissible hearsay. Also, plaintiffs allege that Williams and Rosado had agreed to a two-week time frame for him to renew his driver's license. <u>Id.</u> Williams denied having given Rosado a time frame to renew the license (Docket No. 45-14, p. 17, L. 6-8; p. 44, L. 8-12; p. 45, L. 1-5). In any event, the objection does not contest the statement.

102.[56]  He added the "lines for renewals [we]re very long [and that he] expect[ed] to have his license renew[ed] asap." See, SUMF at ¶ 102.[57] Lisath subsequently forwarded Rosado's response to Hernández, SUMF ¶ 103,[58] who investigated whether the Centros del Servicio al Conductor ("CESCO"), where individuals renew licenses in Puerto Rico, were closed during the period that Rosado indicated. See, SUMF ¶ 104.[59] And he found out that contrary to what Rosado had stated, the CESCO offices were not closed from November through January, and that some CESCO locations even opened on Saturdays. See, SUMF ¶ 105.[60] At the close of business on March 6, 2014, Williams informed Rosado he could no longer drive on company business until he had a valid driver's license and requested his presence at her office for a phone meeting with Hernández and Lisath the following day. See, SUMF ¶ 106.[61]

---

[56] Plaintiffs object to this statement arguing that the record cited does not support the fact asserted. See, OSMF ¶ 102. However, one of the records cited, the email exchange between Mulhern and Rosado, supports the statement.

[57] Plaintiffs object to this statement claiming that the record cited does not support the fact asserted. See, OSMF ¶ 102. One of the records cited, the email exchange between Mulhern and Rosado, supports the statement.

[58] Plaintiffs object to this statement contending that evidence cited was not properly authenticated by Xerox. See, OSMF ¶ 103. As explained in the Appendix, the evidence cited was properly authenticated.

[59] Plaintiffs object to the statement pointing out that the evidence cited in support was not properly authenticated by Xerox. See, OSMF ¶ 104. As explained in the Appendix, the evidence was properly authenticated. Additionally, plaintiffs deny the statement stating that Hernández's search revealed that there had been "a raid at one or two DMV office locations in Puerto Rico due to an FBI investigation," and that Hernández only conducted his research online and did not call the Department of Transportation offices. Id. The denial does not contradict the statement.

[60] Plaintiffs object to the statement alleging it contains a wrong characterization of Rosado's communication inasmuch as he did not assert that all CESCO offices were closed during the mentioned period and that Hernández's internet search allegedly revealed that people had the option to renew their license online, which was not true. See, OSMF ¶ 105. Rosado's message, however, states "In PR the offices that expedite the renewals [were] closed from November until the last week of January" (Docket No. 45-8, p. 1). And even though Hernández's message did state "you also have the option to renew your license online" it also states, "Three of the five DMV locations are open on Saturdays from 9-1." Id. In consequence, the objection does not contradict the statement.

[61] Plaintiffs deny this statement asserting that Williams and Rosado "agreed in a verbal conversation that he would stay in the office until he renewed his license." See, OSMF ¶ 106. The denial does not contradict the statement.

On March 7, 2017, Hernández, Lisath and Williams interviewed Rosado as part of the investigation into the expired license. <u>See</u>, SUMF ¶ 107.[62] Rosado stated he had made attempts to renew his driver's license, but that the CESCO offices had been closed from November 2013 until sometime in January 2014, that the lines thereafter were too long and, thus, he could not wait in line that long. <u>See</u>, SUMF ¶ 108.[63] Additionally, he mentioned that two CESCO offices were closed due to a Federal Bureau of Investigation ("FBI") raid. <u>See</u>, SUMF ¶ 108.[64]

### D. Employment Termination

In general, Lisath would review an employee's entire personnel file and consider all corrective action letters, regardless of the date they were given, to determine whether the employee previously received a final warning letter advising him/her about the possibility of being terminated for future company violations. <u>See</u>, SUMF ¶ 119.[65] Xerox policy allows for

---

[62] Plaintiffs qualify this statement claiming that Rosado did not recall Lisath's being a part of the conversation. <u>See</u>, OSMF ¶ 107. The qualification does not contradict the statement.

[63] Plaintiffs deny this statement contending that an FBI investigation into the Department of Transportation involved the raid and closing of some CESCO offices, including those in Rio Piedras and Carolina, two locations close to where Rosado lived. <u>See</u>, OSMF ¶ 108. Furthermore, they deny this statement on the contention that Rosado explained to Hernández and Williams that according to the news on television "the lines were huge and impossible to work with in a hectic work schedule like Rosado's." <u>Id.</u> The denial does not contradict the statement.

[64] Plaintiffs deny this statement pointing out that an FBI investigation into the Department of Transportation involved the raid and closing of some CESCO offices, including those in Rio Piedras and Carolina, two locations close to where Rosado lived. <u>See</u>, OSMF ¶ 108. Furthermore, they deny this statement on the contention that Rosado explained to Hernández and Williams that according to the news on television "the lines were huge and impossible to work with in a hectic work schedule like Rosado's." <u>Id.</u> The denial does not contradict the statement.

[65] Plaintiffs deny this statement stating that Lisath testified she would review the personnel file and look to see if there were any letters given to the employee and if there were previous policy violations, even though that would not mean that it would lead to termination and she would not verify the details of the investigation or confirm if in fact a violation occurred. <u>See</u>, OSMF ¶ 118. The testimony does not support plaintiffs' denial. <u>See</u>, Docket No. 54-11, pp. 11-12. Additionally, plaintiffs argue that it is contested whether it was customary to look at all of an employee's discipline letters regardless of the year they were emitted because Luz Barreto, who was Xerox' Human Resources Manager for over ten years, admitted that during the 2012 policy violation investigation she did not consider Rosado's 2002 previous offense because it was remote and she testified that Xerox policy allowed for repeated violations "after a second offense … depending on the severity of it." <u>See</u>, OSMF ¶¶ 118, 124. Additionally, she testified that Xerox policy allowed for termination for repeated policy violations "after a second offense…depending on the severity of it." <u>See</u>, OSMF ¶ 124. But Ms. Barreto retired from Xerox in November 2013 (Docket No. 66, Attachment I, p. 11, L. 14-21), and was not a participant in the investigations into Rosado's attempt to circumvent the collections process

termination of an employee who has repeatedly violated company policies, regardless of the seriousness of each individual violation, and even if the violations are not related to the same conduct. <u>See</u>, SUMF ¶ 125.[66] Generally, Lisath would not consider an employee's performance nor the employee's tenure in recommending a corrective action as a result of a policy violation. <u>See</u>, SUMF ¶ 122; OSMF ¶ 22.[67]

While compiling the Policy Violation Investigation Report ("PVIR") in connection with the Optimática and driver's license incidents, Lisath reviewed Rosado's file and noted that he had prior policy violations, including those relating to harassment and mistreatment of other employees

---

[66] Plaintiffs deny this statement alleging that Luz Barreto, the previous Human Resources Manager, testified Xerox policy allowed for termination for repeated policy violations "after a second offense…depending on the severity of it," OSMF ¶ 124, and that Marlene Williams testified that "when a policy violation occurs if you are given a formal warning rather than termination and you get another one shortly thereafter you can be terminated." <u>Id</u>. Neither statement contradicts that an employee could be terminated for repeated policy violations of different kinds and varying in severity. For a more detailed discussion about Barreto's and Williams's testimony, <u>see</u> immediately preceding footnote.

[67] Xerox distinguishes between performance-based and policy-violation driven terminations (Docket No. 55-8, p. 21, L. 1-6).

---

or regarding his driver's license. Likewise, she was not part of the decision-making process that culminated in termination of Rosado's employment with the Company. And in response to the question "So there was no period of time from a policy investigation to another that you had to limit your investigation to?," she unambiguously responded, "That is correct" (Docket No. 45-20, p. 48, L. 13-16). At bottom, then, that in one instance in 2012 Barreto did not check Rosado's record in connection with a policy violation does not mean that there is a genuine dispute on whether, at that time or thereafter, it was customary to look at all of an employee's letters regardless of the year they were emitted, particularly in the absence of evidence that is was a repeated occurrence under Barreto's tenure or that it occurred at all under Lisath's tenure following Barreto's retirement from the Company. Finally, plaintiffs assert that Marlene Williams testified that "when a policy violation occurs if you are given a formal warning rather than termination and you get another one shortly thereafter you can be terminated." <u>See</u>, OSMF ¶ 124. As support, they refer the court to lines 15-20 of page 83 of Williams's deposition. <u>Id</u>. Termination may occur in those circumstances. Yet Williams was also asked for a specific time frame between warning and termination, and she said she did not know the time frames (Docket No. 55-8, p. 83, L. 21-24). She pointed out that for policy violations, there is an option to get a formal warning, and if the employee has another one, he can be terminated (Docket No. 55-8, p. 33, L. 5-8). Counsel interjected "… [We] were asking performance," and the deponent responded "Okay. I don't recall the time frame" (Docket No. 55-8, p. 83, L. 21-24). And Williams said, "When we have to make a termination decision, the HR folk – people or manager is the person that brings **all of the history together and looks at it in its totality**" (Docket No. 55-8, p. 84, L. 2-5)(emphasis added). Further, she explained, "…HR sits … and walk[s] through all the entire package **to take a look at all the personnel – the person's file and all the – everything that's there, and they look at it holistically** …" (Docket No. 85-5, p. 56, L. 3-16)(emphasis added). From Ms. Williams's testimony, it is apparent that the totality of the employee's file is examined. In consequence, contrary to what plaintiffs assert, Williams' testimony does not contest the statement.

and the use of his corporate credit card for personal expenses.  See, SUMF ¶ 123.[68]  On March 10,

2014, she finalized the PVIR, recommending that Rosado be terminated.  See, SUMF ¶ 124.[69]  The

PVIR lists the following incidents underlying policy violations in support of termination: (1)

Rosado had been driving for the company with an expired license since June 25, 2013; (2) on

February 25, 2014, he was advised that his driver's license had expired and directed to renew it

and provide proof of renewal, which he had not done as of March 7, 2014; (3) he lied about not

having been able to renew his driver's license, indicating that the CESCO offices were closed from

November 2013 until the end of January 2014 and the investigation confirmed that not all CESCO

offices were closed; (4) Rosado ignored the collection accounts receivable policy by requesting

that a customer in good standing provide supplies to a customer on stop supplies status; (5) on

May 30, 2002, Rosado received a Warning letter for creating an environment of fear, distrust and

antagonism, being demeaning towards women and threatening employees with loss of their jobs,

and was removed from a managerial position; and (6) on February 21, 2012, he received a Written

Warning Letter for personal use of the corporate credit card in 160 transactions between October

2011 and January 2012 in the amount of approximately $12,000.  See, SUMF ¶ 126.[70]

---

[68] Plaintiffs deny this paragraph, arguing that it is a characterization of Lisath's testimony.  See, OSMF ¶ 123.  But the evidence cited supports the statement.  Also, plaintiffs rely on the fact that the warning letter was not attached to the PVIR.  Id.  However, that fact does not contradict the statement.

[69] Plaintiffs qualify the statement claiming that, although Lisath testified that she recommended Rosado's termination based on several policy violations, Xerox never corroborated the violation that Rosado had bypassed the "Stop Services/Stop Supplies" policy, and Rosado was given an opportunity to renew his license, which he later did, on March 15, 2014.  See, OSMF ¶ 123.  The qualification does not contradict the statement.

[70] Plaintiffs deny this statement on several grounds.  First, they assert that Lisath prepared the PVIR in collaboration with Williams.  See, OSMF ¶ 125.  However, they admit that Lisath prepared Part B of the PVIR, within which the reasons listed above were stated.  Id.  Plaintiffs further argue that Lisath lists contradictory reasons for his termination in the PVIR.  Id.  They note she recommended Rosado's termination for driving for the company with an expired driver's license, but she concluded that Rosado drove the company vehicle with an expired driver's license even though Rosado did not drive a company vehicle from January 2013 until March 2014; Rosado was not aware of the Company Vehicle Policy because Xerox did not provide him with copy of the Policy, which in plaintiffs view was not applicable to Rosado because he drove his personally owned car as part of the Auto Equity Program; and Williams

Thereafter, Lisath met with Williams informing her she recommended that Rosado's employment be terminated, and Williams agreed with the recommendation. See, SUMF ¶ 127.[71] The policy violation report was compiled and sent to Williams' supervisor, Lauren Hession, Senior Vice President of the Eastern Region, for her signature and approval. See, SUMF ¶ 128.[72] Hession concurred with the termination recommendation. See, SUMF ¶ 128.[73] An involuntary termination request document was prepared, along with supporting documentation and submitted for review and approval on March 10, 2014. See, SUMF ¶¶ 129-130.[74] On March 13, 2014, the request was forwarded to Xerox's Office of General Counsel, Human Resources Business Operations, and the

---

admitted that with regards to the driver's license issue, the policy that Rosado violated was VEH 002, the Auto Equity Program. Id. Furthermore, they express that according to Lisath, Rosado stated that "Puerto Rico MVR offices were closed from November 2013 until January 2014," yet "confirmation was made that the … offices were not all closed." Id. Plaintiffs state that Rosado did not specify that all CESCO offices were closed and he had told Hernández and Williams that during that period of time, the offices were closed and in accordance with the news, the lines were huge and impossible to work with considering Rosado's hectic schedule. Id. Finally, they point out that Xerox did not corroborate Vázquez' allegations and did not complete the investigation regarding the purported policy violation, which Rosado denied. Id. None of these statements contests that Lisath outlined in her report the stated violations as reasons for Rosado's termination.

[71] Plaintiffs deny this statement alleging that Williams testified the final determination was made by her and her manager, Lauren Hession, and that Williams did not consider pre-2014 offenses in the record. See, OSMF ¶126. They refer to Williams's deposition (Docket No. 55-7, p. 18). In that page, Williams responded to a question that starts at page 17, ending at page 18, specifically, "Do you agree that the reasons included in that section of the answer to the complaint (Affirmative Defenses) are the only reasons considered by Xerox to terminate Rosado's employment?" to which Williams answered, "Yes." Paragraph 7 of the Affirmative Defenses of Xerox's answer list the following reasons for termination of Rosado's employment: driving with expired license for several months, lying to company management and other Xerox personnel during an investigation into the situation, arranging the provision of supplies to a delinquent, non-paying customer, personal use of a corporate American Express card, and behaving unprofessionally by creating an environment of fear, distrust, and antagonism in the workplace (Docket No. 7, p. 10,. ¶ 7). The denial does not contradict the statement.

[72] Plaintiffs qualify this statement arguing that the PVIR contained multiple incorrect references to purported policy violations. See, OSMF ¶ 127. But this does not contest that Hesson agreed with Lisath and Williams' recommendation.

[73] Plaintiffs qualify this statement pointing out that the PVIR contained multiple incorrect references to purported policy violations. See, OSMF ¶ 127. But this does not contest that Hesson agreed with Lisath and Williams' recommendation.

[74] Plaintiffs qualify this statement stating that the Involuntary Termination Request prepared by Lisath contained multiple incorrect references to purported policy violations. See, OSMF ¶ 128. This does not contradict the statement.

Vice President of the Human Resources Organization.  See, SUMF ¶ 131.[75]  By March 13, 2014,

Rosado had not renewed his driver's license.  See, SUMF ¶ 132.[76]  His employment terminated

effective March 20, 2014.  See, SUMF ¶ 133; OSMF ¶ 132.

## III.    DISCUSSION

### A.  Law 80: General Principles

#### 1.  *Description and Scope of Statutory Coverage*

Law 80 makes private sector employers liable for an indemnity to employees hired for

undefined term who are discharged without just cause.  See, Article 1 of Law 80, P.R. Laws Ann.

tit. 29 § 185a (stating coverage and payment obligation).[77]  The indemnity is the only remedy for

---

[75] Plaintiffs qualify this statement alleging that the Xerox policy requires various levels of approval depending on an employee's age and tenure.  See, OSMF ¶ 130.  They add that neither the legal department nor a human resources manager could change a manager's decision to terminate an employee even if they disagreed with termination.  Id. The qualification does not contradict the statement.

[76]  Plaintiffs qualify the statement arguing that Rosado was given the opportunity to renew his driver's license and by March 13, 2014 he was still within the time frame agreed to obtain it, and he was not notified he could be terminated for not submitting a valid driver's license.  See, OSMF ¶ 132.  They refer in part to Rosado's deposition (Exhibit A, p. 192), where he mentions that Marlene Williams agreed to a two-week period to renew the license (id.), an assertion that Williams denied (Docket No. 45-14, p. 17, L. 6-8; p. 44, L. 8-12; p. 45, L. 1-5).  At the end of the day, the qualification does not contradict the statement.

[77] As of the date of Rosado's termination, the indemnity consisted of: (A) two months' pay plus one week's pay for each completed year of service in case of employees with up to five years of service; (B) three months' pay plus two weeks of pay for each completed year of service in case of employees with more than five but less than fifteen  years of service; and (C) six months' pay plus three weeks' pay for each completed year of service in case of employees with fifteen or more years of service,  P.R. Laws Ann. tit. 29 § 185(a).  See, Soto-Lebrón v. Federal Express Corp., 538 F.3d 45, 55 (1st Cir. 2008)(describing Law 80 compensation formula).  The indemnity is colloquially referred to as "mesada."  See, Carrasquillo-Ortiz v. American Airlines, Inc., 812 F.3d 195, 196 (1st Cir. 2016)(mentioning term); Otero-Burgos v. Inter American University, 558 F.3d 1, 8 (1st Cir. 2009)(same).  As explained by Jorge L. Capó-Matos in M.J. Caterine, *Employment at Will: A State-by-State Survey-Puerto Rico Chapter* (2011), pp. 932 n. 176, 935 n. 185, "mesada" is a Spanish-language term, denoting a monthly payment, which has its distant origin in Article 302 of the Spanish Commerce Code of 1886.  With regard to the termination of an employment relationship not subject to a fixed term, Article 302 provided that either party was free to terminate the relationship giving a month's notice, but the merchant could provide a month's salary in lieu of notice.  It was codified as Article 220 of the Puerto Rico Commerce Code (1911 Compilation).  Law 43 of April 28, 1930 granted employees hired for undefined term in a for-profit industry or business who were discharged without just cause without 15-day notice, the right to receive from the employer the salary of one week, two weeks or a month, depending on the frequency with which the employee was paid.  Law 84 of May 12, 1943, amended Law 43 to provide that every employee of an industry or other lucrative business whose services were contracted without a definite term and who was discharged without just cause, would be entitled to receive, in addition to such salary as he may have earned, an indemnity of one month's salary.  The statute did not apply to commercial shop clerks or factors subject to the Commerce Code.  Law 50 of April 20, 1949,

unjust discharge available to an employee hired for undefined term who is dismissed without just cause. See, Weatherly v. International Paper Co., 648 F.Supp. 872, 875, 877-878 (D.P.R. 1986)(articulating formulation). Damages may not be awarded unless the employee can establish that the employer committed an independent tortious act in the course of terminating the employment relationship or violated labor-employment legislation providing for recovery of damages. See, Soto-Lebrón, 538 F.3d at 55 (wrongfully terminated employee cannot recover emotional distress damages for termination itself, as the only remedy available to an employee at will for a mere discharge without just cause in Puerto Rico is that provided by Law 80, but if other independent tortious actions concur with the discharge, the employer may be held liable for such conduct).[78] If the discharge "is determined justified under the statute, no discharge indemnity payment is due." Capó-Matos, supra at 934-935. In that case, the Law 80 action must be dismissed.

A prior employment relationship must be shown to benefit from statutory coverage. See, *Puerto Rico Department of Labor and Human Resources' Revised Guidelines for the Interpretation and Application of Law No. 80 of May 30, 1976, As Amended* (June 30, 2014 Rev.),

---

repealed Article 220 and Law 43 as amended by Law 84, establishing Puerto Rico's first comprehensive wrongful discharge statute, with an indemnity equivalent to one month's pay. For approximately 27 years after the enactment of Law 50, the statutory wrongful discharge indemnity payment was limited to the equivalent of one month's salary. Law 50 was replaced by Law 80 in 1976 to, among other things, increase the amount of indemnity to be paid in the event of a dismissal without just cause. Additional increases in the indemnity were legislated through succeeding years. The Labor Transformation and Flexibilization Act of 2017, Law No. 4 of January 26, 2017, amended Law 80 to, among other things, modify the indemnity formula to limit compensation. See, Article 4.3 of statute. Given that the 2017 statute is prospective, however, it does not apply to the present case.

[78] On this same subject, to the extent a specific labor-employment law covers the conduct for which an employee seeks damages, he is barred from relying on that same conduct to sustain a tort claim. See, Reyes-Feliciano v. Marshalls, 159 F.Supp.3d 297, 310 (D.P.R. 2016)(articulating formulation). Tort claims must be based on "conduct distinct" from that subject to the specific labor-employment laws invoked. Rivera-Meléndez v. Pfizer Pharmaceutical, Inc., 747 F.Supp.2d 336, 339 (D.P.R. 2010). The remedy available to the employee will be the remedy established in those labor/employment laws. See, Reyes-Feliciano, 159 F.Supp.3d at 310(so noting); Franceschi-Vázquez v. CVS Pharmacy, 183 F.Supp.3d 333, 344-345 (D.P.R. 2016)(dismissing tort claim because plaintiff failed to point to tortious conduct separate from that covered by employment discrimination laws).

pp. 40-41 (addressing statutory coverage).[79] The statute does not apply to independent contractors.

Id. There is no evidence that Rosado's spouse or legal conjugal partnership were ever employed by Xerox for undefined term, much less discharged from Xerox employment. Consequently, their Law 80 claim falls beyond the scope of the statute's coverage and must be dismissed. See, Flamand v. American Intern. Group, Inc., et al., 876 F.Supp. 356, 372 (D.P.R. 1994)(dismissing employee's spouse's Law 80 claim, given that the statute only provides a cause of action for employees, and the spouse was never defendants' employee).[80]

### 2. *Just Cause*

Law 80 contains a general definition of just cause and provides guidance on the application of this concept through various examples, relating to employee misconduct and performance, and downsizings and shutdowns. See, Article 2 of Law 80, P.R. Laws Ann. tit. 29 § 185b (general definition and examples).[81] In this setting, a just discharge is one where the employer provides a considered, non-arbitrary reason for an employee's termination that bears some relationship to the business' operation. See, Echevarría v. AstraZeneca Pharmaceutical LP, 856 F.3d 119, 140 (1st Cir. 2017)(stating proposition). Examples of just cause include: (a) a pattern of improper or disorderly conduct by the employee, (b) the attitude of the employee of not performing his work in an efficient manner, or of doing it belatedly and negligently or in violation of the standards of quality of the product produced or handled by the establishment, (c) the employee's repeated

---

[79] The *Guidelines* were created by virtue of the power conferred upon the Secretary of Labor and Human Resources of Puerto Rico to adopt and promulgate regulations for the administration of Law 80. See, Carrasquillo-Ortiz, 812 F.3d at 206 (so explaining).

[80] Notwithstanding dismissal, the court will maintain reference to "plaintiffs," as such is the term generally used in the summary judgment record.

[81] For a detailed and comprehensive discussion of this topic, see Capó-Matos, supra at pp. 936-969 and 2014 Cumulative Supplement, at pp. 40-15-40-22.

violations of the reasonable rules and regulations established for the operation of the establishment, provided a written copy has been opportunely furnished to the employee, and (d) three other grounds related to shutdowns, restructurings, and downsizings. See, Article 2 of Law 80, 29 P.R. Laws § 185b (laying out examples).[82] By contrast, a discharge made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment is not considered just. Id.

**B. Law 80: Procedural Framework**

Under Law 80, the employee bears the initial burden of alleging unjustified dismissal and of proving termination. See, García-García v. Costco Wholesale Corporation, 878 F.3d 411, 420 (1st Cir. 2017)(describing framework). If the employee meets this burden, the burden shifts to the employer to show, by a preponderance of the evidence, that the discharge was justified. Id. If the employer shoulders the burden, the employee must rebut the showing of just cause. Id.

**C. Application of Framework**

Plaintiffs met his initial burden, for there is no controversy that Rosado's employment terminated and according to the complaint, Rosado's employment terminated without just cause (Docket No. 1, ¶¶ 3.42, 4.2, 4.3). As to Xerox's burden, the Company presented evidence that the decision to terminate Rosado's employment was based on behavior underlying the following policy violations: (1) harassment by Rosado; (2) Rosado's deliberate misuse of the corporate card for personal expenses; (3) Rosado's circumventing Xerox's collections process by arranging for supplies to be provided to a customer in arrears; (4) Rosado's driving on Xerox business with an

---

[82] Examples (a), (b) and (c) involve situations attributable to the employee whereas the remaining three examples involve situations attributable to the employer. See, *Revised Guidelines* (2014 Rev.), p. 45 (describing just cause examples); Capó-Matos, supra at 938-939 (same).

expired driver's license and not renewing it as directed; and (5) Rosado's untruthfulness during the investigation into the expired driver's license.[83]

In addition, the evidence shows Xerox investigated the incidents, and had a reasonable basis to believe that Rosado had violated the company's policies. Even if, as Rosado has alleged, the investigations may have been imperfect, Xerox did not decide to terminate Rosado out of whim. And it put forward considered, serious, non-arbitrary grounds for Rosado's termination, grounds reasonably linked to the Company's business. Therefore, it has established just cause to discharge Rosado. See, Barakat v. Taco Bell, 970 F.Supp. 634, 639-640 (N.D.Ill. 1997)(verbal abuse toward subordinates legitimate reason for termination); Elrod, 939 F.2d at 1470 (harassing employees legitimate reason to fire plaintiff); Vega-Ruiz v. Wal-Mart Puerto Rico, Inc., 2010 WL 5376124, *4-*5 (D.P.R. Dec. 27, 2010)(misuse of corporate credit card valid basis for termination); Bailey v. Ford Motor Co., 2006 WL 2620279, *2, *5 (E.D. Mich. Sept. 13, 2006)(describing employee's use of corporate credit card for unauthorized purchases that were most likely for personal use as a violation of company policy and simple ethics); Jarjoura v. Ericsson, Inc., 266 F.Supp.2d 519, 530 (N.D. Tex. 2003)(use of corporate credit card for personal expenses licit rationale for discharge); Chuang v. T.W. Wang Inc., 647 F.Supp.2d 221, 238-239 (E.D. N.Y. 2009)(violation of company's collection policy legitimate ground for dismissal); Brummett v. Lee Enterprises, Inc., 284 F.3d 742, 745 (7th Cir. 2002)(employee legitimately

---

[83] Plaintiffs allege Lisath or Williams told Hernández that Rosado had been discharged for "insubordination" (Docket No. 73, p. 3). This is a broad-encompassing category, susceptible of covering different instances of violations to policies or rules, including lying to the employer and disregarding directives. See, Svienty v. Whirlpool Corp., 408 F.Supp.2d 466, 476-477 (W.D.Mich. 2005)(employer simultaneously considered employee's working for another employer while calling in sick and lying about it, "theft," "insubordination" and "gross misconduct"); Stewart v. Spirit Airlines, Inc., 503 Fed. Appx. 814, 812 (11th Cir. 2013)(insubordination associated with failure to adhere to employer's directives); Capo v. Port Angeles School Dist. No. 121, 2008 WL 1999759, *3 (W.D.Wash. May 8, 2008)(same); Vann Nelson v. City of Chicago, 2000 WL 1221637, *3 (N.D.Ill. Aug. 21, 2000)(similar). All said, the key action document prepared for the collective review and approval of in-house counsel, management, and decisionmakers, contains the specific grounds Xerox relied on to terminate Rosado's employment.

terminated from advertisement sales job in part due to lack of a driver's license to legally drive vehicle to customers' locations on company business); Hardy v. Federal Exp. Corp., 1998 WL 419716, *2, 5 (E.D.La. Jul. 21, 1998)(termination for knowingly driving with expired license); Parker v. Georgia-Pacific Corp., 247 Fed.Appx. 507, 509 (5th Cir. 2007)(dishonesty valid reason for termination); Amezquita v. Beneficial Texas, Inc., 264 Fed.Appx. 379, 386 (5th Cir. 2008)(termination legitimately based on management's belief that plaintiff lied during investigation); Total System Services, Inc., 221 F.3d at 1173, 1176 (lying during internal investigation legitimate reason for discharge). To withstand summary judgment, plaintiffs had the burden to rebut Xerox's showing. They raise various arguments, discussed below.

### 1. Nature of Employment/Knowledge of Statute

Plaintiffs allege Xerox acted without just cause because Lisath said that Xerox's general policy regarding separation of full-time, salaried employees was "employment at will," stated she did not review Law 80 with regards to Rosado's termination (Docket No. 55, p. 10 L. 18- p. 11 L. 4), and Williams testified that she did not know what Law 80 is (Docket No. 54, p. 5). The concept of "employment at will" is not inconsistent with Law 80, which "covers employees who typically would be considered 'at-will' employees in other jurisdictions within the United States." Capó-Matos, supra at 889.

Generally, in an "employment-at-will" setting, an employment relationship of an indefinite duration may be terminated at the will of either party, for a good reason or a bad reason, without recourse to the other party. See, I Paul H. Tobias, *Litigating Wrongful Discharge Claims*, Thomson West (2006), pp. 1-2, 1-3 (discussing topic); Capó-Matos, supra at 889 (same). Thus, in that setting the employer may dismiss an employee at any time, for any reason, without compensating the employee for the discharge. See, Otero-Burgos, 558 F.3d at 8 (explaining

concept); I Henry H. Perritt, *Employee Dismissal Law and Practice* (6th Ed. 2018), John Wiley & Sons, p. 1-3 (similar). Various state courts, however, have recognized a variety of exceptions to this rule, allowing employees to recover damages when they can show that their terminations violated employer promises, implied covenants or clear public policies, or did not comport with good faith and fair dealing. See, Henry H. Perritt, supra at 1-3 (identifying exceptions).[84]

In turn, Law 80 permits discharges at any time, for any reason, with a modification: that the employer pay a statutory indemnity in the absence of just case for the termination. See, Pérez v. Horizon Lines, Inc., 804 F.3d 1, 9 (1st Cir. 2015)(acknowledging statutory modification); Soto-Lebrón, 538 F.3d at 55 (noting that Law 80 provides the exclusive remedy for the mere discharge without just cause of "at-will" employees in Puerto Rico). The statute does not authorize reinstatement or injunctive relief to prevent dismissals, thus maintaining the same "severance-at-any time for any reason" structure embedded in traditional "employment-at-will" relationships.

Yet just as some courts in stateside jurisdictions have attempted to balance the interest of protecting employees from arbitrary discharge with the employer's freedom of choice, so in enacting Law 80 the Puerto Rico Legislature sought to balance the same interests. See, Weatherly, 648 F.Supp. at 875-877 (examining issue). Hence, it protected employees hired for undefined term from arbitrary termination without unreasonably limiting employers' freedom to manage their business, by making employers liable, not for damages, but for a statutory indemnity in absence of just cause for the discharge. Id. Given these parallels, Lisath's comment about Xerox's general policy does not equal or imply liability. See, Ramos-Santiago v. WHM Carib, LLC, *4 (D.P.R. March 14, 2017)(rejecting argument that employer's rulebook was unenforceable for stating that

---

[84] For a discussion of cases on this subject, see, "Modern Status of Rule that Employer May Discharge At-Will Employee for Any Reason," 12 A.L.R. 4th 544.

employer had an "employment-at-will" policy in light of overlap between Law 80 and the "employment-at-will" doctrine).

In the same vein, that Lisath did not review Law 80 or Williams did not know the statute is immaterial. It was the responsibility of Xerox's Office of General Counsel to advise management if there was a legal issue regarding the termination (Docket No. 45-13, p. 40 L. 24- p. 41 L. 2) even if in-house counsel could not change the business' decision (Docket No. 73, p. 3 n. 6). At the end of the day, what matters is that, like with any other employer sued under Law 80, Xerox be prepared to satisfy the just cause criterion.

### 2. Remoteness of Offenses

Plaintiffs assert that the 2002 warning (for creating an environment of fear, distrust and antagonism, being demeaning towards women and threatening employees with the loss of their jobs) and the 2012 warning (for improperly using the corporate credit card for personal expenses) are remote and should not be considered here (Docket No. 54, p. 19; Docket No. 73, p. 12). As support, they refer to Longo-Ortiz v. SIGMA Security Services & Forensic Consultants, 2014 WL 5099274 (P.R. App. Aug. 19, 2014) and López-Crespo v. Hotel El Conquistador, 2013 WL 4603023 (P.R. App. Jun. 21, 2013), judgments from different panels of the Puerto Rico Court of Appeals (Docket No. 54, p. 19; Docket No. 73, pp. 13-16), (Docket No. 73, p. 16). But there are judgments from other panels of the same Court arguably contrary to plaintiffs' stated position. See, Santiago-Marrero v. Ranger American of Puerto Rico, Inc., 2015 WL 10091391 (P.R. App. Dec. 18, 2015); and Romero v. Baxter Healthcare Corp. of Puerto Rico, 2014 WL 3172968 (P.R. App. May 30, 2014).

More important, review of Law 80 confirms the statute does not contain a prohibition against considering an employee's entire disciplinary record in evaluating a potential dismissal,

and in <u>Miranda-Ayala</u> v. <u>Hosp. San Pablo</u>, 170 D.P.R. 734 (2007)(P.R. Offic. Trans.) and <u>Báez-García</u> v. <u>Cooper Labs., Inc.</u>, 120 D.P.R. 145 (1987)(20 P.R. Offic. Trans. 153), the Puerto Rico Supreme Court considered all of the disciplinary actions in the employee's personnel file in deciding whether the employer had just cause for termination. <u>See</u>, <u>Miranda-Ayala</u>, 170 D.P.R. at 735-736 (P.R. Offic. Trans. at 2)(taking into account for 2004 termination, documented problems from 1983, 1992, 1997, 2001, and 2004); and <u>Báez-García</u>, 120 D.P.R. at 148-150, 153-155 (20 P.R. Offic. Trans. at 155-158, 163 (considering deficiencies identified in evaluations covering totality of plaintiff's tenure with the company from 1973 to 1981 in determining whether to terminate plaintiff's employment).[85]

On this formulation, the employer may consider an employee's entire disciplinary record when deciding to terminate an employee, unless the employer has a policy providing that disciplinary actions expire after a certain period. <u>See</u>, <u>Moreta</u> v. <u>First Transit</u>, 39 F.Supp.3d 169, 180 (D.P.R. 2014)(employer subject to collective bargaining agreement prohibiting company from considering performance issues older than 12 months in making a disciplinary or employment decision). And there is no evidence that Xerox had any such policy. To the contrary, not only did Lisath testify without contradiction that Xerox considers all disciplinary actions in an employee's record, no matter the time period between them, SUMF ¶ 119, but Rosado himself admitted that it was customary to review an employee's file prior to terminating an employee. <u>See</u>, SUMF ¶ 120.

Plaintiffs argue the 2002 "Final Warning" was "expunged" from Rosado's personnel file, as Luz Barreto, a former Human Resources Manager, did not consider it at the time she conducted the 2012 policy investigation (Docket No. 55, p. 8, ¶ 35). However, not even Rosado alleged that

---

[85] <u>Longo-Ortiz</u> and <u>López-Crespo</u>, the cases plaintiffs cite for support, are not persuasive. They do not acknowledge or discuss the Puerto Rico Supreme Court's rulings in <u>Miranda-Ayala</u> and <u>Báez-García</u>.

Xerox had an "expungement" policy or practice. No such policy has been produced. And review of Barreto's deposition transcript reveals she never testified that disciplinary actions were expunged from personnel records. Rather, her testimony was that she did not review Rosado's personnel file when she prepared the *Policy Violation Investigation Report* regarding Rosado's use of his Corporate American Express Card to cover personal expenses (Docket No. 65-6, p. 8). Barreto's omission could not reasonably have operated to prevent the Human Resources Manager handling the 2014 termination from considering the entire file consistently with Xerox's policy.[86]

### 3. Collective Process

Plaintiffs contend that the court should only consider the infractions or events that in their view, the main decision makers took into account (instead of the whole record, hence excluding the 2002 and 2012 violations)(Docket 54, pp. 11, 12, 19). As support, they cite a judgment from the Puerto Rico Court of Appeals, Avilés-Cotto v. Autozone Puerto Rico, Inc., 2016 WL 1640146 (P.R. App. 2016), where the Court found that the employee's prior disciplinary actions were irrelevant for purposes of assessing the legitimacy of the termination because management did not consider those violations at the time of termination. The Human Resources Manager had drafted a document recommending termination of employment based on the employee's latest policy violation. In this way, the document only made reference to the precipitating event prompting the employee's termination, not the whole disciplinary record. It was not until after the complaint was filed, that the Human Resources Manager proffered she had also considered the employees prior disciplinary actions when recommending the employee's discharge. So coupled with other testimony at trial, the Court did not find it credible that the employer had considered the prior

---

[86] As stated earlier, Barreto left the Company in 2013 and did not participate in the decision-making process that lead to Rosado's dismissal.

disciplinary actions when deciding to terminate the employee. As a result, it concluded that the older disciplinary actions should not be taken into consideration when assessing the legitimacy of the termination because they were not part of the reason for terminating the employee.

By contrast, it is uncontested that Lisath reviewed Rosado's entire employee file prior to recommending termination in March 2014, and that she confirmed Rosado had two prior disciplinary actions in his record. Also, it is undisputed that Lisath considered all disciplinary actions in Rosado's record in recommending that Rosado's employment be terminated. And contrary to the facts in Avilés, the *Involuntary Termination Request* that Lisath prepared and submitted for review and approval contained all of the disciplinary actions against Rosado.[87]

Plaintiffs state that Williams and Hession made the final determination as to Rosado's termination (Docket No. 54, p. 12; Docket No. 55, p. 8, ¶ 148) and that Williams testified that she only considered the incidents she personally knew about (that is, those of 2014). It is uncontroverted that Williams was assigned to Puerto Rico in 2013 and had no personal knowledge of the policy violations that Rosado committed in 2002 and 2012.[88] Still, it was not Williams's responsibility to review Rosado's personnel file; that was Lisath's responsibility. And in the end, neither Williams nor Hession objected to the Involuntary Termination Request which Lisath prepared, a document which included all violations Rosado engaged in during his employment with Xerox.

Plaintiffs posit that the review and approval from various levels of management of the *Involuntary Termination Request* was essentially a "rubber stamp," as the final decision rested on

---

[87] Docket No. 45-42; Docket No. 65-8.

[88] Hession had knowledge of Rosado's 2012 Written Warning. See Exh. R (Docket No. 45-25).

the business (Docket No. 73, pp. 2-3). However, not only is the record devoid of evidence to

support such view but Lisath declared that although the business made the final decision, "**[a]ny**

**level …of approval if they have any questions, they can come back and, say, ask any questions**

**in terms of pushing back. It could be the business, it could be HR, the highest level of HR, it**

**could be the highest level of the business as well**…." (Docket No. 45-11, p.80, L.19-25; p. 81, L.1-

4). Therefore, the termination process was an interactive one between the different levels of

approval, where any level could challenge the recommended action.

### 4. He Said/She Said

Plaintiffs assert Xerox was not able to corroborate that Rosado circumvented the

collections process by arranging to provide supplies to a Xerox customer, Optimática, who was on

"Stop Service/Stop Supplies" status due to arrearages (Docket No. 54, p. 12). They proffer

Hernández could not corroborate Vázquez's testimony, and that it all became a "he said/she said"

situation. Id. at 14.

Hernández's review of Rosado's business cellphone records did not independently confirm

around the time of the event that Rosado had spoken to Tañón on January 27, 2014.[89] Yet once

Hernández finalized his part of the investigation he referred the next steps to Lisath and Williams

without making any recommendation as to what action Xerox should take (Docket No. 55-20, p.

26 L. 15-21).[90]

---

[89] Xerox points out that phone records for the correct date (January 27, 2014) confirm there were several calls between Rosado and Tañón (Docket No. 44, p. 10). The court assumes that Xerox had not so confirmed as of the date of Rosado's termination. On this basis, it will not consider the "after acquired" evidence of the phone records for purposes of ruling on Xerox's motion for summary judgment.

[90] Hernández does not know what motivated Xerox to terminate Rosado's employment (Docket No. 55-19 p. 19 L. 18-20).

This aside, Xerox need not demonstrate without any doubt that Rosado indeed circumvented the collections process. The First Circuit has held that the "just cause" inquiry focuses not on the objective veracity of the employer's action but on the employer's reasonable belief. See, Echevarría, 856 F.3d at 140 (so recognizing). A perceived violation suffices to establish that the employer did not terminate the employee on a whim rather than for a sensible business-related reason. See, Pérez, 804 F.3d at 10 (applying formulation).

To this end, the question is not whether plaintiff's or his fellow employee's version is the true one but whether the investigator and his superiors believed what he had been told by those he interviewed. See, Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005)(so stating). Where the employer's investigation "produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions – that is, to accept one as true and to reject the other as fictitious – at least as long as the choice is an honest choice." Total Systems Services, Inc., 221 F.3d at 1176. Thus, in the event an employee is discharged based on a complaint lodged by another employee, the focus turns on the extent to which the employer reasonably believed the complaining employee's allegation and acted on it in good faith or, to the contrary, did not believe the co-employee's allegation and used it as a pretext to carry out an otherwise wrongful discharge. See, Johnson v. Barr Air Patrol, L.L.C., 2009 WL 854807, *8 (N.D.Tex. March 31, 2009)(explaining concept).

On these principles, Xerox did not act on a whim. It conducted an investigation, which included obtaining a written statement and interviewing Vázquez and Rosado, and which lead it to reasonably conclude that Rosado circumvented the collections process. First, Vázquez immediately notified his supervisor, Luz Negrón, of the events that led Vázquez to believe that Rosado was attempting to circumvent Xerox's collection process. Second, there was no

supervisory relationship between Vázquez and Rosado. Vázquez was a Credit Representative assigned to the Collections organization, while Rosado was in the Sales organization. Third, there is no evidence to suggest animosity between Vázquez and Rosado or that Vázquez would have any reason to falsely accuse Rosado of a policy violation. Fourth, Negrón, with Vázquez's assistance, prepared a written statement stating what transpired between Rosado and Vázquez and what Vázquez overheard. Fifth, Vázquez' testimony during his interview with Lisath, Hernández, Williams and Negrón, was totally consistent with the written statement and with what he had reported to his supervisor, Negrón.

Based on these facts, it was reasonable for Lisath to find Vázquez credible. See, Ronda-Pérez, 404 F.3d at 45 (plaintiff denied the alleged misconduct but could not attribute any adverse motive or bias to the persons that the Human Resources Officer interviewed during the corresponding investigation); Finley v. Florida Parish Juvenile Detention Center, 2013 WL 4710404, *10 (E.D.La. 2013)("… Finley was accused of inappropriate comments by a subordinate, McDonald, not by a supervisor who would have any input or influence on the Center's disciplinary decision. McDonald promptly reported her discomfort with plaintiff's comments to her own supervisor, Donald Carter. When Carter reported the incident to his superiors, there was an independent investigation by upper management, during which McDonald, Finley, Carter and another employee, Joy Chauvin, documented in wiring the events they had observed. The Center's Executive Director, Jarlock, was the ultimate decision maker. He made his own credibility determination in favor of McDonald's complaint and against Finley's version of events).

In like manner, the Human Resources Officer in Ronda Pérez found those he interviewed credible. See, Ronda-Pérez, 404 F.3d at 45 (so noting). The interviewees were consistent, and the Officer "knew of no reason to disbelieve them." Id. at 46. So too here. Plaintiffs then had to

adduce probative evidence that Lisath did not genuinely believe Vázquez. See, García-García, 878 F.3d at 421 ("[Employee] had to adduce probative evidence that [the employer] did not genuinely believe in or did not in fact terminate [employee] for the reason given"'); Echevarría, 856 F.3d at 141 (similar). And they did not do so. In consequence, no genuine issue exists on this matter. See, Elrod, 939 F.2d at 1470 (even though much of plaintiff's proof at trial centered around whether he was in fact guilty of the harassment allegations leveled at him by his former co-workers, the evidence did not show that the employer's asserted belief in those allegations was unworthy of credence).[91]

Plaintiffs state that the collections policy did not apply to Rosado, only to service representatives, which he was not, implying it was inappropriate for Xerox to consider this policy to terminate Rosado's employment (Docket No. 73, p. 11). The argument overlooks the fact that Rosado acknowledged that as a Xerox employee, it was his obligation to read and understand Xerox's business policies; never knowingly violate Xerox's policies; and exercise initiative and responsibility to avoid doing so (Docket No. 45-6).[92] More broadly, though, the collection policy advances the important business goals of promoting payments from delinquent customers and limit

---

[91] Plaintiffs state that Xerox did not seek to corroborate the information further with Tañón (Docket No. 54, p. 13), despite the fact that Barreto testified Xerox would go "outside" during investigations (Docket No. 55-2, p. 47 L. 11-15). As previously mentioned, Barreto left Xerox in 2013. And Lisath said Xerox would investigate anyone relevant to the case or who could clarify the situation (Docket No. 45-10, p. 3 L. 20-p. 4 L. 3), asserting, nevertheless, that normally Xerox would not call a customer on a policy investigation and would not have engaged the customer in that situation (Docket No. 45-12, p. 46 L. 6-14). Likewise, Hernández pointed out Xerox does not involve customers in its investigations to avoid creating animosity between the customer and Xerox (Docket No. 55-20, p. 7 L. 16-22; p. 8 L. 9-14).

[92] Even though Xerox did not provide Rosado with a written copy of the Company's *Collection of Accounts Receivable* policy (Docket No. 65, p. 22), Rosado was knowledgeable of the policy and of "Stop Service/Stop Supplies" (Docket No. 45-3, p. 24 L. 22 – p. 25 L. 19; Docket No. 45-4, p. 36 L. 2 – p. 37 L. 9). As Williams pointed out, the sales organization was intimately knowledgeable of the policy (Docket No. 55-9, p. 41 L. 19-23).

loss due to nonpayment, which contribute to revenue leaks (Docket No. 44, p. 11).[93]  And although

the policy informs credit representatives what they need to do to collect and Rosado was not a

credit agent, to say that sales employees like him do not have to respect the collection protocol,

and by implication, that they are at liberty to bypass it, would be counterintuitive.  If allowed to

go forward, it would defeat the collection process, potentially impacting the Company's cash flow

and profitability to the detriment of shareholders and employees.  As such, the policy violation

bore a direct relationship to the Company's business, qualifying as just cause for the discharge.

**5.  Driving with an Expired Driver's License**

Rosado was a participant in Xerox's Auto Equity Program (VEH 002), pursuant to which,

as noted earlier, Xerox reimburses employees for expenses associated with the business use of a

personally owned or personally leased motor vehicle (Docket No. 45, pp. 14, 15).  Employees need

a valid driver's license to participate in the Program and by extension, violate company policy if

they drive on company business without the license.  Id.  By February 2014, Rosado had been

driving with an expired license since June 2013.  Id.  On February 25, 2014, Robert Mulhern

(Xerox Security Analyst) alerted Rosado as to the expired license, informing him that he had to

renew the license as soon as possible.  Id. at 15.  By March 6, 2014, Rosado had not responded to

the email, leading Muhern to send a follow-up message to Rosado warning him he had to renew

the license that same day in order to continue to drive on Xerox business.  Id.  But by March 10,

2014, when Lisath recommended termination, Rosado had not renewed the license.  Id. at 20.

Hence, Lisath included this fact as one of the policy violations for termination.

---

[93] Revenue is lost when a customer does not pay.  And a rational incentive to payment such as is incorporated in the collection policy is eroded to the extent the non-paying customer receives needed supplies or service from a third party instead of Xerox.

In this deposition, Rosado denied having seen before that day the Auto Equity Program document (Docket No. 45-3, p. 26 L. 12-19).  He asserts that when he signed up for the Program, he received an email with the documents he had to submit; those documents were the liability insurance policy and the car license; and after uploading the documents, he was approved for the Program (Docket No. 45-3, p. 27 L. 21 – p. 28 L. 7).  In context, however, it was reasonable for Xerox to have expected Rosado to be aware of the Program's driver's license requirement. Rosado's online training record confirms acknowledgment of the Program's policy (Docket No. 45-8, p. 2 L. 42, p. 4 L. 23); he admitted receiving an update on it (Docket No. 45-3, p. 26 L. 20-21); and in response to Mulhern's messages of February 25, 2014 and March 6, 2014 he did not deny knowledge of, nor challenged or questioned the applicability of the driver's license requirement to participate in this Program.  Moreover, he admitted that Mulhern's February 2014 request came from the Auto Equity System because he (Rosado) was participating in the Program (Docket No. 45-3, p. 25 L. 20 – p. 26 L. 6).[94]  And in any event, at least from Mulhern's February 2014 email Rosado had knowledge of the licensing requirement.

Plaintiffs argue that according to the Program's own terms, an employee that does not satisfy eligibility requirements is removed from the Program (Docket No. 54, pp. 16-17).  They claim that nowhere in the Program's guidelines can it be found that a violation results in termination.  Id.  Xerox counters that the Auto Equity Program falls under the Company's Motor Vehicle Policy (VEH001), which according to Xerox: is the mother or umbrella policy (Docket No. 45, p. 17); references the Auto Equity Program (Docket No. 45, pp. 1, 12); and specifies that

---

[94] Parenthetically, when Rosado was asked during the deposition, "Isn't it true, Mr. Rosado, that you were required to possess a valid driver's license to participate in the Program?" he responded, "To renew it, no" (Docket No. 45-3, p. 30 L. 5-12).  That a document may not have been needed for renewal does not mean it was not needed to enroll in a program in the first place.

Xerox may take disciplinary action up to and including termination for any reason related to the policy (Docket No. 45, p. 17). In addition, Xerox states that Rosado completed training on the Motor Vehicle policy on February 11, 2013, before he let the driver's license expire. Id.[95] Plaintiffs respond that the Motor Vehicle Policy applies to the use of company owned and leased vehicles, which Rosado had not used since January 2013, and while the policy refers to the Auto Equity policy, it does not specifically provide that auto equity drivers had to comply with the Company's Motor Vehicle policy. Id.

An employer is entitled to interpret its policies as it sees fit, and where that interpretation is reasonable there is no occasion for judicial second-guessing. See, Toland v. AT&T, 2011 WL 13177025, *15 (N.D.Ga. April 20, 2011)(applying principle to recognize employer's interpretation of policy even though the employee's description could be read in the manner that the employee suggested); Svienty, 408 F.Supp.2d at 476-477 (fact that employer's policy did not expressly define the term "gross misconduct" did not preclude employer from concluding that plaintiff's actions constituted gross misconduct when the employer provided a reasonable and honest explanation for its determination). And it was not unreasonable for Xerox to interpret the policies in an integrated manner, particularly when the umbrella policy (VEH 001) specifically references the Auto Equity Program (VEH 002)(Docket No. 45-41, pp. 1, 12) and the Auto Equity Program references the Company's Vehicle Policy) (Docket No. 45-37, p. 7). Federal courts do not sit as a "super personnel department" substituting their business judgment for that of employers. Le Blanc v. Great American Ins. Co., 6 F.3d 836, 847 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018 (1994).

---

[95] Rosado alleges that such training dealt with skills on how to drive safely (Docket No. 45-3, p. 27 L. 1-13). Nonetheless, Rosado's Learning History shows an additional Vehicle policy acknowledgement on August 30, 2011 (Docket No. 45-8, p. 2 L. 42), and there is no claim that it only dealt with safe driving.

Beyond this issue, to be duly licensed to drive a car while on company business – even an employee-owned car rather than a company car – is commonsensical and does not have to be spelled out in any manual or policy. Lack of a specifically enumerated prohibition on doing something "does not necessarily mean that an employee has free reign to do so without fear of repercussions." Nailon v. University of Cincinnati, 2016 WL 6581839, *3-*4 (S. D.Ohio Nov. 7, 2016)(applying principle to sustain plaintiff's termination for having worked on her son's collection account even though it was not specifically spelled out in the employer's policy at the time the asserted misconduct occurred, as plaintiff's conduct also appeared to be a violation of the State's ethics rules).

Driving on an expired license does not violate Puerto Rico's ethics statute, Law 1 of January 3, 2012, as amended, P.R. Laws Ann. tit. 3 § 1854 et seq. But it violated the Commonwealth's Vehicle and Traffic Law of 2000, Law 22 of January 7, 2000, P.R. Laws Ann. tit. 9 § 5051, for Article 3.01 of Law 22 provides that "[n]o person may drive a motor vehicle on the public roads of Puerto Rico without the due authorization of the Secretary [of the Department of Transportation and Public Works of Puerto Rico]" who "shall certify through a license, all authorizations to drive a motor vehicle on the public roads." P.R. Laws Ann. tit. 9 § 5051. The prohibition is not to be taken lightly. Article 3.23 of Law 22 states that driving a motor vehicle on the public roads of Puerto Rico without being duly authorized by the Secretary of the Department of Transportation and Public Works is a misdemeanor carrying upon conviction a fine of $100.00 for the first offense and fines of not less than $200.00 for each repeated violation. See, P.R. Laws Ann. tit. 9 § 5073(a).[96] In consequence, Law 22 precluded Rosado from legally driving on Xerox

---

[96] In his deposition, Rosado initially recognized it is against the law to drive without a driver's license (Docket No. 45-3, p. 32 L. 8-14), but then said that contrary to the situation in the States, in Puerto Rico it is not against the law to drive without a driver's license (Docket No. 45-4, p. 8 L. 7-19).

business with an expired driver's license. And the Auto Equity Program provides that the use of a vehicle for business purposes will be in full compliance with all federal, state and local laws (Docket No. 45-37, p. 2).

Along with the illegality, driving with an expired license on company business created a potential liability problem for Xerox. In Puerto Rico, the employer may be held vicariously liable under 1803 of the Civil Code for damages resulting from the tortious conduct of employees acting within the scope of their employment for the employer's benefit. <u>See</u>, P.R. Laws Ann. tit. 31 §1542 (imposing *respondeat superior* liability on employers for damages caused by their employees in the circumstances stated therein). So in <u>Vernet</u> v. <u>Serrano-Torres</u>, 566 F.3d 254 (1st Cir. 2009), the First Circuit observed that in evaluating an employer's potential liability under Article 1803, the court should ask "whether or not the employee's acts fall within the scope of his employment in the sense that they furthered a desire to serve and benefit the employer's interest, resulting in an economic benefit to the employer." <u>Id.</u> at 261.

The situation that an employee creates when he drives his own car on company business matches this scenario. <u>See</u>, <u>Vernet</u>, 566 F.3d at 257, 261 (recognizing that the employer could be held liable under Article 1803 for damages caused by one of its employees, who left an employer-sponsored party driving his own vehicle while intoxicated, striking plaintiff's vehicle and causing her multiple physical and economic injuries).[97] Rosado used his car to conduct Xerox business (Docket No. 45-3, p. 34 L. 2-5).[98] And lack of a valid driver's license by the driver of the vehicle involved in an accident may serve as an important link in the chain of events leading to liability.

---

[97] For a discussion of cases on this topic, <u>see</u>, "Employer's Liability for Negligence of Employee in Driving His or Her Own Automobile," 27 A.L.R. 5th 174.

[98] Plaintiffs assert it was not a condition of Rosado's employment to drive a motor vehicle for Xerox business (Docket No. 54, p. 16). But he opted to do so.

See, Usera v. González, 74 P.R.R. 454, 457-460 (1953)(sustaining liability under Article 1803 of

the Civil Code for damages arising out of automobile accident because agent of dealer negligently

allowed potential purchaser of vehicle to drive it without a driver's license).[99]

Plaintiffs allege that Williams gave Rosado an additional two-week period to renew the

driver's license at the beginning of March 2014 (Docket No. 54, p. 18) – an allegation Williams

denies (Docket No. 45-14, p. 18 L. 17-20) – and Rosado renewed the license during this period

(Docket No. 54, pp. 18-19). Rosado, however, never mentioned the "Williams period" in his

March 6, 2014 response to Mulhern or during the meeting held to discuss the license issue. For

that reason, Xerox cannot be faulted for not having honored any such period. And in the end,

Rosado had been driving without a valid license for a significant time frame, oblivious to the

---

[99] On this issue, Barreto confirmed that driving without a driver's license is a serious violation because it put Xerox at risk as if there was an accident, people would request that Xerox provide them with a financial or economic benefit (Docket No. 65-6, p. 9 L. 25 – p. 10 L. 13). Rosado, however, said that Xerox was never at risk because Rosado's coverage was active, and the insurer would not cancel a policy in Puerto Rico on account of an expired driver's license, albeit it would do so in the States (Docket No. 45-4, p. 7 L. 20 – p. 8 L. 6). The term "coverage" refers to inclusion of a risk under an insurance policy, that is, "the risk within the scope of the policy." *Black's Law Dictionary* (10th Ed.), p. 446. When a policy is cancelled, it is no longer in force and provides no coverage even as to risks that otherwise would be covered by the policy. See, Zilka v. State Farm Mut. Auto Ins. Co., 662 S.E. 2d 777, 779-780 (Ga.App. 2008)(sustaining denial of coverage after policy cancellation). Relatedly, a policy may be active but still preclude coverage by way of an exclusion applying to the circumstances described in the exclusion clause. See, UBS Financial Services, Inc. of Puerto Rico v. XL Specialty Insurance Co., 929 F.3d 11, 26 n. 13(1st Cir. 2019)(applying formulation); Easthampton Congregational Church v. Church Mutual Insurance Company, 96 F.3d 86, 91-92 (1st Cir. 2009) (setting forth framework to evaluate covered risk in light of arguably applicable exclusion). In this connection, a policy of automobile liability insurance may make an express exception with respect to a loss or harm sustained while the automobile is driven by anyone in violation of laws relating to driver licensing. See, *Couch on Insurance* 3d, § 110:51, p. 110-87 (so noting). And the fact that Rosado's coverage may have been active does not mean that Xerox was covered unless the policy included the Company as an insured party. Normally, a policy that only names individuals as the insureds does not provide coverage for liability incurred by the corporation just as a policy that only designates a corporate entity as the named insured does not automatically insure the corporation's members or employees. Id. at § 40.15, p. 40-26 (discussing topic). At the name insured's request, an insurer may permit other individuals or entities to be added as an additional insured on the named insured's policy. Id. at § 40:26, p. 40-42. Often, this is accomplished pursuant to a specific endorsement expressly naming the individual or entity as an additional insured on the policy. Id. Rosado expressed that he obtained insurance but did not specify if the policy protected Xerox (Docket No. 43-3, p. 29 L. 22 – p. 30 L. 4). The policy was not made part of the record and this is not an item of which the court may take judicial notice under Fed. R. Evid. 201.

potential repercussions of his behavior.[100]  As a result, properly considered, the violation reflects a legitimate ground for termination linked to the Company's business justifying the discharge.[101]

### 6. Lying

Separate and apart from the expired driver's license problem was Rosado's dishonesty during the investigation into the issue, for he lied as to why he did not renew his driver's license when told to do so, lying to Mulhern as to the time that the CESCOS were closed, and then to Lisath, Williams and Hernández.[102]  Lying to the employer "is an act of dishonesty." Movimiento Solidario Sindical v. Pepsiamericas, Inc., 2009 WL 10681120, * 9 (D.P.R. Sept. 14, 2009).  The Supreme Court of Puerto Rico has recognized that, "[a] civilized society cannot legitimate a lie or raise it to the rank of virtue." Autoridad de Edificios Publicos v. Union Independiente de Empleados de la Autoridad de Edificios Publicos, 130 D.P.R. 983, 985 (1992)(P.R. Offic. Trans. at 1).  Lying "tends to destroy the employer-employee dynamics and affects the good operation of the company." Miranda-Ayala, 170 D.P.R. at 741 (P.R. Offic. Trans. at 5).  In the same way, false statements impair the employer's ability to make sound decisions important to the employer's legal, economic and ethical well-being. See, Total System Services, Inc., 221 F.3d at 1176 (so

---

[100] If Rosado only became aware of the need to renew the license on February 25, 2014 (a Tuesday), and due to work commitments could not spare time to do it during weekdays, there were two intervening Saturdays (March 1st and March 8th) when he could have renewed the license before Lisath forwarded her termination recommendation for evaluation and approval on March 10, 2014.  Rosado waited nine days (from February 25th to March 6th) to inform Malher that he would renew the license "asap" but his behavior lacked a sense of urgency proportional to the problem Xerox objectively was trying to address in directing him to renew the license.

[101] In Feliciano-Martes v. Sheraton Old San Juan, 182 D.P.R. 368, 401-403, 405 (2011), the employee was dismissed after being absent seven consecutive working days.  He only contacted his superior the day prior to his first day of absence, even though the employer's rules required employees to notify the supervisor each day of expected absence at least two hours prior to the beginning of the regular shift.  The Puerto Rico Supreme Court concluded that the employee violated the daily notification rule on six occasions.  By March 2014 Rosado had been driving without a valid license for approximately eight months.

[102] As mentioned earlier, Rosado said the CESCOS closed from November 2013 to the last week of January 2014.

recognizing).  Thus, the employer is entitled to expect and require truthfulness from its employees in internal investigations.  Id.

Xerox's PVIR form has a section of possible mitigating or aggravating factors, including the employee's honesty or dishonesty during the investigation.  Lisath not merely checked the box (Docket No, 45-28, at p. 4) but considered the fact that Rosado had been dishonest in the process. Plaintiffs argue that Rosado's statement was an exaggeration, a figure of speech not serious enough to warrant termination (Docket No. 54, pp. 22-23).  However, the subjective opinion of the employee is irrelevant. "That plaintiff may think that what [ ] he did was not serious enough for termination, does not mean that she did not commit the violation or that the violation was not serious." Bonilla-Ramirez v. MVM, Inc., 2017 WL 2712884, at *11 (D.P.R. Mar. 30, 2017). Rosado's dishonesty constitutes just cause for discharge.

### 7. Policies

Plaintiffs argue Xerox cannot prevail because it is relying on policy violations to justify the discharge, a justification that requires evidence that the employer provided written copy of the policies to the employee, and Xerox submitted no such evidence (Docket No. 54, p. 9; Docket No. 73, p. 10).  As previously discussed, Article 2 of Law 80 recognizes as just cause, non-arbitrary reasons bearing some relationship to the business' operation.  And as examples of just cause, it refers to, among others, a pattern of improper or disorderly conduct (Subsection a); not performing work in an efficient manner or doing it belatedly and negligently, or in violation of the employer's standards of quality (Subsection b); and repeated violation of the employer's reasonable rules and regulations, provided written copy of them was provided to the employee (Subsection c). Misconduct, omissions, or deficiencies may be covered by more than one Subsection.  See, Capó-Matos, supra at 954 (so explaining).

Xerox's policies were on-line, accessible to all employees through the Company's internal website (Docket No. 55 at ¶ 10). There is no authority for the proposition that an employer cannot furnish written copy of its policies by electronic means. And Rosado knew he had the obligation to read and understand the policies applicable to his position (Docket No. 45-1, p. 46 L. 9-12). He received training on the policies he had to adhere to (Docket No. 45-2, p. 9 L. 3-5) and on the Code of Business Conduct (Docket No. 45-1, p. 50 L. 4 - p. 51 L. 10). He was familiar with Human Resources policies regarding equal employment opportunity, non-discrimination and harassment (Docket No. 45-2, p. 22 L. 10-25). He knew that Xerox did not permit bullyng, humiliating or harassment of employees (Docket No. 45-2, p. 11 L. 12 – p. 12 L. 15).

Rosado signed the American Express Corporate Card Application for Xerox (Docket No. 45-22), agreeing to use the corporate credit card for Xerox business purposes only. Id. He was familiar with the policy that the credit card was for Xerox business, not for personal expenses (Docket No. 45-3, p. 6 L. 5-21). He acknowledged the Motor Vehicle Program-Auto Equity policy (Docket No. 45-8, p. 2 L. 42), admitted receiving an update on it (Docket No. 45-3, p. 26 L. 18-22), and at the latest by February 25, 2014, knew that he was driving on Xerox business with an expired driver's license and of the need to renew the license. Additionally, he was aware of Xerox's collections policy and of the "Stop Service/Stop Supplies" mechanism the Company used to collect overdue payments from customers (Docket No. 45-4, p. 35 L. 21 - p. 37 L. 9; OSMF ¶ 58).

An employer that relies exclusively on Subsection (c) of Article 2 may be deprived of the ability to invoke this subsection as justification for the discharge if it has not furnished the employee written copy of the rules, unless the employee accepts he knew the rule or there is sufficient evidence of such knowledge. See, Capó-Matos, supra at 954-955 (so recognizing)(citing

*Revised Guidelines* (2000 Rev.) in force as of Rosado's termination at p. 36). Yet, as noted, in this instance not only was written version of the policies online and accessible to all employees, but Rosado had knowledge of the policies that Xerox invoked to justify the discharge.[103]

Plaintiffs complain that Xerox needed to provide Rosado with rules and regulations that informed him which infractions were considered of a serious enough nature that could lead to termination (Docket No. 54, pp. 9, 15). The First Circuit rejected a similar argument in González v. El Día, Inc., 304 F.3d 63 (1st Cir. 2002), a case where the plaintiff argued that she did not have adequate notice of the consequences of her actions under Law 80. Id. at 75. The First Circuit pointed out that the plaintiff violated the conflict-of-interest provision of the Collective Bargaining Agreement ("CBA"), of which she presumably had notice, and engaged in what the Court described as a series of infractions, namely, defaulting on a promissory note and working for a competitor of the employer in violation of the CBA. Id. The character of the infractions dictated their weight in the just cause calculus, not their link to previously announced, fixed penalties for the infractions.[104]

---

[103] Considering the seriousness of Rosado's misconduct, the incidents underlying the policy violations qualify as just cause for termination in themselves even though they were also covered by company policies. To this end, Article 2(c) may relate to issues arguably covered by other provisions of Article 2 without need to prove that the employer had established and furnished the rules to the employee. See, Capó-Matos, supra at 954 (examining interaction between the different components of Article 2). Still, as discussed in the text, that requirement was complied with, and Xerox showed that Rosado had knowledge of the relevant policies.

[104] The First Circuit's approach comports with the Puerto Rico Supreme Court's description of "just cause" presented in Srio. del Trabajo, v. G.P. Inds., Inc., 153 D.P.R. 223 (2001), as a dynamic concept, nourished by a multiplicity of fluid situations that make it unsuitable to serve as a code of conduct containing a list of clearly defined infractions linked to fix sanctions for every conceivable instance of misconduct. Id. at 243 (describing "just cause"). So, as stated in the text, the character of the infractions dictates their weight in the just cause calculus. The employer may fix specific penalties to instances of unacceptable behavior but is not required to do so. See, SLG Torres-Matundan, 193 D.P.R. at 934-936(Cert. Trans. at 7-9) (employer had just cause to discharge a physician who threatened and assaulted another employee in a case where employer's regulation provided that physical assault or threats to the wellbeing of any person in the employer's premises justified the imposition of disciplinary measures; the regulation did not specify that the measure would be termination but could include verbal admonishment, written admonishment, suspension from job and salary, and/or dismissal).

Similarly, in <u>Miranda-Ayala</u>, 170 D.P.R. at 739, 741 (P.R. Offic. Trans. at 2, 4, 6), the employer's manual stated that dishonesty and undue appropriation of another's property (apropiación indebida de propiedad ajena) would not be tolerated. And when previously disciplined, plaintiff had been warned that he could be subject to further disciplinary measures, including discharge. So too with Rosado, for he acknowledged that violation of Xerox policies could result in corrective action, up to and including termination (Docket No. 45-1, p. 46 L. 24 - p. 47 L. 4).

The Code of Conduct stated that Xerox did not tolerate bullying, discrimination, harassment, and false information in reporting processes (Docket No. 45-9 pp. 5, 17). When Xerox reprimanded Rosado for creating an environment of fear, being demeaning toward women, screaming at employees and threatening them with the loss of their jobs, it warned him that "any future violation of Business Policies, for whatever reason, will be cause for more severe corrective or disciplinary action up to and including termination" (Docket No. 45-21, pp. 1-2). Likewise, when Xerox reprimanded Rosado for violating the American Express corporate card policy,[105] he was also warned that any other violation of business policies/guidelines could result in more severe corrective or disciplinary action, up to and including termination (Docket No. 45-25). Furthermore, Xerox informed Rosado that the manager was available to answer questions if at any time clarification was needed of any of Xerox's policies, business conduct guidelines, procedures and processes (Docket No. 45-25). Rosado was aware of Xerox's legitimate rules and expectations. There was no asymmetry of information preventing compliance. Under these

---

[105] Rosado was aware of the fact that abuse of the corporate card was a violation of Xerox's policy, subject to disciplinary action, up to and including termination (Docket No. 45-3, p. 7 L. 2-9).

circumstances, Rosado cannot reasonably disclaim knowledge of the policies he was subjected to or the potential consequences of violating them.

### 8. Progressive Discipline

Plaintiffs state that Xerox did not exhaust other forms of progressive discipline with Rosado for driving with an expired driver's license (Docket No. 54, p. 17). Law 80 does not require progressive discipline in every case. See, SLG Torres-Matundan, 193 D.P.R. at 934-936 (termination at first offense without prior warnings or disciplinary measures). Thus, Xerox did not have to proceed with progressive discipline when it discovered that Rosado was driving on company business with an expired license, even less so when barely two years earlier he had been disciplined for willfully using his corporate credit card to cover personal expenses in violation of company policy and explicitly warned for a second time that any future violation could lead to employment termination. Besides, the termination only took place after Rosado lied to Mulhern, and then to Lisath, Williams and Hernández.[106]

### 9. Performance

Plaintiffs assert that Rosado had an extraordinary performance during his tenure with Xerox, receiving many accolades and multiple salary increases (Docket No. 54, pp. 22-23). Evidence of stellar performance may be used to rebut a termination based on poor performance, but that is not the case here, as Xerox's reason for terminating Rosado's employment was not poor performance. It is uncontested that Xerox considers neither an employee's performance nor the employee's tenure when recommending action for policy violations. See, García-García, 878 F.3d at 421 (rejecting plaintiff's attempt to rely on his history of frequent promotions, high ratings on

---

[106] From this perspective, termination would be sustained by just cause even discounting the collection and motor vehicle policy violations.

quality inspections, and high monthly average sales to rebut employer's good-cause showing under Law 80, for the employer did not terminate him for poor performance); Echevarría, 856 F.3d at 137 n. 23 (rejecting argument that plaintiff's history of "stellar performance" had not been considered, as the employer did not seek to justify termination on the ground that plaintiff's performance was deficient).

### 10. Economic Benefit

Plaintiffs allege that Xerox obtained economic benefits from Rosado's termination, as his successor had a base salary of $57,000, $27,692 less than Rosado's, had no tenure in the Company, and contrary to Rosado, would not have been entitled to retirement benefits in less than a year (Docket No. 54, p. 24). There is no evidence that Xerox considered in any way or manner potential payroll or retirement savings as grounds for termination.

### 11. Termination Procedure

Plaintiffs argue there is a genuine issue of material fact as to whether Xerox followed its own procedure on separation of full time salaries employees (Docket No. 54, p. 11). They maintain that while Lisath testified Xerox policy allows for the termination of an employee with repeated violations of company policies regardless of the level or seriousness of each individual violations, Barreto had testified that not all policy violations led to discharge because it depended on the severity of the offense. Id. There is no issue. The instances of employee misbehavior underlying Rosado's termination are serious and sustain the finding of just cause for termination under Law 80. See, Mercedes Bus Line v. District Court, 70 P.R.R. 656, 661 (1949)(dishonesty and disobedience to the employer's rules and instructions considered just cause for discharge).

### 12. Damages

Plaintiffs request damages for age discrimination and emotional distress (Docket No. 1, p. 8).[107]  The Complaint invokes neither the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA") nor the Puerto Rico general antidiscrimination statute, Law 100 of June 30, 1959, as amended, P.R. Laws Ann. tit. 29 § 146 et seq., which like the ADEA prohibits discrimination in employment because of age.  Id. at § 146.  In Puerto Rico, though, relatives of a person who has been the victim of employment discrimination may bring emotional damage claims pursuant to the general tort statute and its *respondeat superior* counterpart, Articles 1802 and 1803 of the Civil Code, P.R. Laws Ann. tit. 31 §§ 5141 and 5142, to be compensated for harm to them resulting from the discrimination.  See, Pagán-Cólon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 15-16 (1st Cir. 2012)(discussing topic).

Such claims are derivative and cannot survive independently of the principal plaintiff's underlying employment discrimination action.  Id.  If the principal plaintiff's claim fails, so too does the relative's derivative claim.  Id.  To be available to relatives in a derivative action, relief for emotional damages must be available to the employee under the labor-employment provision under which the principal's action is brought.  See, Jesús v. Sanofi Aventis Puerto Rico, Inc., 2017 WL 972100, *8 (D.P.R. March 3, 2017)(recognizing principle)(citing SLG Pagán-Renta v. Walgreens, 190 D.P.R. 251, 253, 267 (2014)(P.R. Offic. Trans. at 2, 7)).

Plaintiffs represented that Rosado is only pursuing a remedy under Law 80 (Docket No. 15, ¶ 3); the ADEA "does not allow compensatory damages for pain and suffering," Collazo v.

---

[107] At Docket No. 45-1, the parties stipulated that the only cause of action that Rosado has is that of unjust dismissal under Law 80.  Id. at p. 11, L. 4-13.  At Docket No. 15, they represented that counsel had conferred about the possibility that Rosado's spouse and conjugal partnership would withdraw from the case.  Id. at ¶ 3.  No such withdrawal occurred.

Nicholson, 535 F.3d 41, 44 (1st Cir. 2008); and albeit Law 100 does so – Rodríguez-Torres v.

Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 55-56, 63-66 (1st Cir. 2005)(awarding damages

for emotional distress in action brought, _inter alia_, under Law 100) – the pleadings do not reflect

age discrimination or independent tortious behavior by Xerox entitling plaintiffs to recover

damages of any kind.  In consequence, no discrimination or tort claim, either direct or derivative,

survives the present action on the merits.  See, Hoffman-García v. Metrohealth, Inc., 2018 WL

671200, *9, 12 (D.P.R. Jan. 31, 2018), _aff'd_ 918 F.3d 227 (1st Cir. 2019)(dismissing age

discrimination claims  under the ADEA and Law 100); Reyes-Feliciano, 159 F.Supp.3d at 310

(dismissing employee's relative's derivative claim because it could not survive dismissal of the

employee's discrimination claim); Rivera-Almodóvar v. Instituto Socioeconómico Comunitario,

Inc., 806 F.Supp.2d 503, 508-509 (D.P.R. 2011)(dismissing tort action in absence of distinct

factual allegations sufficient to support a tort claim separate from labor law claims).

Furthermore, any age discrimination or tort claims would be time barred.  To maintain a

private action under the ADEA, an aggrieved party must first file a complaint with the Equal

Employment Opportunity Commission ("EEOC") or a state deferral agency like the

Antidiscrimination Unit of the Puerto Rico Department of Labor and Human Resources ("ADU")

within 300 days of the alleged act of discrimination or 180 days in jurisdictions without laws

against age discrimination and state agencies authorized to investigate those claims.  See, Kale v.

Combined Ins. Co. of America, 861 F.2d 746, 750 (1st Cir. 1988)(addressing issue); Hernández-

Arce v. Bacardi Corp., 37 F.Supp.2d 112, 114 (D.P.R. 1999)(similar).  In turn, Law 100 and tort

claims for emotional distress are subject to the one-year statute of limitations set in Article 1868

of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5298.  See, Cabrero-Pizarro v. Christian

Private Academy, 555 F.Supp.2d 316, 319 (D.P.R. 2008)(Law 100); Rolón Rivera v. Public

Broadcasting Corporation of Puerto Rico (WIPR Radio and TV, 2008 WL 11357878 * 10 (D.P.R.

Sept. 2, 2008)(tort claims).

Moving from the general to the particular, there are no allegations that Rosado timely

exhausted – or exhausted at all – administrative remedies under ADEA. Additionally, Rosado's

employment terminated in March 2014; the Complaint was filed more than one year later, in

December 2015; and although the Complaint refers to a letter that Rosado sent to Xerox on April

1, 2014 (Docket No. 1 at ¶ 3.35), the letter was not included in the record and, in any event, there

are no allegations or evidence that Rosado filed a timely administrative claim under Law 100

before the ADU within the limitations period with notice to Xerox, thereby tolling the statute of

limitations while the claim was pending in the agency as permitted by Law 100.[108]

Nor are there allegations that Rosado otherwise interrupted the limitations period in accordance

with Article 1873 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 § 5303, in a way that

would have activated anew the running of the period to ensure a timely judicial filing in this case.[109]

See, Alejandro-Ortiz v. Puerto Rico Elec. Power Authority, 756 F.3d 23, 25 (1st Cir.

2014)(dismissing as untimely extracontractual damages claim filed after expiration of the one-year

statute of limitations); Pabón-Ramírez v. MMM Healthcare, Inc., 2014 WL 1682865, **5-6

(D.P.R. April 29, 2014)(dismissing ADEA claim for failure to exhaust administrative remedies

---

[108] Law 10 of May 31, 1991, created a special tolling rule for employment discrimination claims brought under Law 100. See, P. R. Laws Ann. tit. 29 § 150. Pursuant to this rule, once an administrative charge has been filed with the Puerto Rico Department of Labor and the employer has been timely notified of the claim, the statute of limitations is tolled with the peculiarity that the tolling effect continues during the entire pendency of the administrative proceeding. See, Rodriguez-Torres, 399 F.3d at 61 (explaining rule). Thus, the limitation period is suspended or frozen until the administrative proceeding has concluded, at which time it begins running afresh all over again. By contrast, under the general tolling rule, upon interruption, the limitations period "starts to run anew" from that point on. Ramos-Báez v. Bossolo-López, 54 F.Supp.2d 121, 124 (D.P.R. 1999).

[109] Article 1873 identifies three mechanisms to interrupt running of the limitations period, to wit: (i) judicial action; (ii) extrajudicial claim; and (iii) any act of acknowledgment of the debt by the debtor. See, Rodríguez v. Suzuki Motor Corp., 570 F.3d 402, 407 (1st Cir. 2009)(analyzing provision).

and Law 100 claim for failure to toll statute of limitations); <u>Amoros Santiago v. Pérez</u>, 687 F.Supp. 34, 35, 38 (D.P.R. 1988)(dismissing as time-barred, employment discrimination claim filed more than one year after the alleged discriminatory event).

## IV. <u>CONCLUSION</u>

As a decision-making model, "just cause is dynamic, and its application contextual." <u>Bonilla-Ramírez</u>, 2017 WL 2712884 at *18. A just discharge is one where the employer provides a considered, non-arbitrary reason for an employee's termination that bears some relationship to the business' operation. An unjust discharge is one made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment. Based on material facts as to which no genuine dispute exists, Xerox did not act on a whim. Rather, it acted on legitimate grounds linked to the operation of the business. The misconduct underlying the policy violations were serious. The employer's decision was not arbitrary. It reflects a reasonable exercise of the discretion that the statute accords employers to manage their business. With this in mind, Xerox's motion for summary judgment was granted and by extension, the case is hereby DISMISSED. Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico, this 27th day of December, 2019.

s/Pedro A. Delgado Hernández<br>
PEDRO A. DELGADO HERNÁNDEZ<br>
United States District Judge